DISCIPLINARY COUNSEL *v.* SHAW.

[Cite as *Disciplinary Counsel v. Shaw,*
110 Ohio St.3d 122, 2006-Ohio-3821.]

(No. 2006–0066—Submitted March 15, 2006—Decided August 9, 2006.)

**Per Curiam.**

{¶ 1} Respondent, William Kerr Shaw Jr., of Portsmouth, Ohio, Attorney Registration No. 0024087, was admitted to the practice of law in Ohio in 1976.

{¶ 2} On February 7, 2005, relator, Disciplinary Counsel, charged respondent with six counts of professional misconduct. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and accepted the parties' stipulations, including relator's withdrawal of Count V. The panel made findings of misconduct and a recommendation, which the board adopted.

### Respondent's Background

{¶ 3} After graduating from law school and relocating to Portsmouth, respondent worked for the Scioto County prosecutor's office for many years, beginning in 1979. In 1995, he was appointed Portsmouth City Solicitor. The next year, respondent opened a private practice in which he remained until he returned to work for the prosecutor's office in 2001. Since August 2004, respondent has been employed as legal counsel by the Scioto County Board of Commissioners. He also has a small private practice.

### Misconduct

#### Count I

{¶ 4} Robert Ramsey retained respondent in November 2002 to represent him in an employment-related claim. Ramsey and respondent signed a fee agreement, and Ramsey paid respondent $1,500 as a retainer. From December 2, 2002, to December 1, 2003, Ramsey called respondent 22 times and left messages. Respondent did not return any of Ramsey's calls.

{¶ 5} Although respondent did not stay in contact with his client, he did research legal aspects of Ramsey's case and write letters on his behalf. Respondent believed that he had advised Ramsey, in accordance with DR 1–104(A), that he did not carry malpractice insurance; however, respondent acknowledged that he did not fully comply with the notification and acknowledgment procedures of the rule.

{¶ 6} Respondent stipulated and the board found that in representing Ramsey, respondent had violated DR 1–104(A) (requiring a lawyer to properly advise a client that the lawyer does not maintain professional liability insurance) and 6–101(A)(3) (prohibiting neglect of an entrusted legal matter).

## Count II

{¶ 7} In early December 2002, Robin Bissell retained respondent to represent her in an employment-related claim. On December 19, 2002, Bissell paid respondent $2,200, of which respondent deposited $200 into his client trust account for costs and the remaining $2,000 into his business operating account. At that time, respondent had done some research on Bissell's case; however, he had not earned the entire $2,000 and was not entitled to pay himself that amount. Several days later, Bissell signed a fee agreement, and sent it back to respondent.

{¶ 8} Respondent believed that he had advised Bissell, as required by DR 1–104(A), that he did not carry malpractice insurance, but he again acknowledged that he did not fully comply with the notification and acknowledgment procedures that the rule requires.

{¶ 9} Bissell periodically provided additional materials and information to respondent about her case. Respondent, however, did not speak with Bissell after their initial meeting, and he did nothing in her case other than conduct some research and review the materials she supplied. In March 2003, Bissell twice asked respondent to return the $2,200 that she had paid him, but he neither responded nor returned her money. In July 2004, after Bissell filed her grievance with relator, respondent sent a $200 check to reimburse her for the fee he had retained to pay the costs of her case.

{¶ 10} Respondent stipulated and the board found that in representing Bissell, respondent had violated DR 1–104(A), 6–101(A)(3), 9–102(A) (requiring a lawyer to deposit client funds into one or more identifiable bank accounts), and 9–102(B)(4) (requiring a lawyer to promptly deliver to a client funds in the lawyer's possession that the client is entitled to receive).

## Count III

{¶ 11} Max Nihiser retained respondent in May 2002 to represent him in an employment-related claim. Nihiser paid respondent $500 for his services and

$200 for costs. Respondent deposited the $200 for costs into his client trust account and deposited the $500 payment into his business operating account, even though he had not yet earned the entire fee.

{¶ 12} Although respondent believed that he had advised Nihiser that he did not have malpractice insurance, he again acknowledged that he did not fully comply with the DR 1–104(A) notification and acknowledgment procedures.

{¶ 13} Respondent negotiated with Nihiser's former employer to obtain a settlement of Nihiser's claims. In December 2002, the employer made a $10,000 settlement offer. Nihiser and respondent discussed the offer and agreed to decline it. Respondent promised Nihiser that he would continue to work on his case.

{¶ 14} From January 2003 through January 2004, Nihiser tried to contact respondent by telephone. Nihiser also wrote to respondent in October 2003. Respondent did not respond to Nihiser's call or letter, and he never obtained an acceptable settlement offer or filed suit on Nihiser's behalf. After Nihiser filed a grievance, respondent reimbursed Nihiser's $200 payment for costs.

{¶ 15} Respondent stipulated and the board found that in representing Nihiser respondent violated DR 1–104(A), 6–101(A)(3), and 9–102(A).

*Count IV*

{¶ 16} In April 1999, respondent agreed to assist the executor in the administration of William Morris's estate. On April 12, 1999, respondent accepted for safekeeping a lockbox containing the only assets in the estate. The lockbox contained $5,994 in cash, a handgun, and personal papers. Respondent did not deposit the cash into a client trust account or open a bank account for the estate. He instead put the lockbox in a desk drawer in his office.

{¶ 17} On or about June 1, 1999, respondent discovered that the lockbox and its contents had been stolen. He filed a police report, but he may not have ever told the executor of the Morris estate about the theft.

{¶ 18} Respondent never did start probate proceedings in the Morris estate. The executor eventually hired new counsel to administer the estate. Neither the executor nor the new counsel was able to contact respondent to discuss the estate. In 2002, one of the heirs to the Morris estate died before she could inherit because of respondent's inaction.

{¶ 19} Respondent stipulated and the board found that respondent had violated DR 1–102(A)(5) (prohibiting conduct prejudicial to the administration of justice) and 6–101(A)(3) in representing the Morris estate.

## Count VI

{¶ 20} In October 2004, relator received grievances from Bissell, Nihiser, and the executor of the Morris estate. Respondent provided a brief response to the Bissell and Morris grievances but did not respond to the Nihiser grievance. On November 1, 2004, and again on November 22, 2004, relator sent three certified letters of inquiry to respondent concerning these grievances. Respondent received the six letters but did not reply.

{¶ 21} Respondent eventually responded to the grievances against him on January 12, 2005, after relator subpoenaed his appearance.

{¶ 22} Respondent stipulated and the board found that respondent failed to fully cooperate in relator's disciplinary investigation and violated Gov.Bar R. V(4)(G) (requiring attorneys to cooperate with and assist in any disciplinary investigation).

## Recommended Sanction

{¶ 23} In recommending a sanction for respondent's misconduct, the board weighed the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 24} As aggravating factors, the board found that respondent had engaged in a pattern of neglect and committed multiple offenses, BCGD Proc.Reg. 10(B)(1)(c) and (d). As mitigating factors, the board found that respondent had not acted with a dishonest or selfish motive. The board also found that respondent had no prior record of discipline and that he had eventually cooperated appropriately in the disciplinary process.

{¶ 25} Respondent also provided mitigating medical evidence showing that he suffers from a mental disability. To have a mitigating effect, a mental disability must be supported by all of the following: (1) a diagnosis of the condition by a qualified health-care professional, (2) a professional determination that the mental disability contributed to the misconduct, (3) a sustained period of successful treatment, and (4) a prognosis from a qualified health-care professional that the attorney will be able to return, under specified conditions if necessary, to the competent, ethical professional practice of law. BCGD Proc.Reg. 10(B)(2)(g)(i), (ii), (iii), and (iv).

{¶ 26} Respondent has been diagnosed with major depressive disorder, and his psychiatrist, Scott J. Lance, M.D., has been treating him since February 2004. Respondent testified before the panel that his problems likely started in 1996, when he became involved in what turned out to be an overwhelmingly complicated case. He then experienced financial setbacks because of that case. His annual income dropped from approximately $120,000 to $26,000 over the next few

years, and by 1998 or 1999, he began to withdraw from the responsibilities of his practice. The death of respondent's father in 2001 also contributed to respondent's depressive state. By 2003, respondent's depression had so affected his marriage that his wife began discussing divorce. Respondent finally sought psychiatric help to save his marriage.

{¶ 27} Dr. Lance testified by deposition that respondent's depressive disorder significantly impeded his ability to concentrate and focus during the time related to the charges against him and led respondent to routinely procrastinate and avoid tasks. Respondent's inability to function professionally and personally, according to Dr. Lance, was consistent with respondent's condition and precipitated the charges against him. Dr. Lance reported that respondent's symptoms have improved with treatment. In fact, provided that respondent continues with regular appointments and medication for the foreseeable future, Dr. Lance said that respondent is currently capable of practicing law competently, ethically, and with a relatively small likelihood of relapse.

{¶ 28} The panel, however, expressed serious reservations about respondent's continuing alcohol consumption, especially in combination with his prescribed medications. Steven LaForge, an attorney and respondent's friend, testified that although he had never personally noticed signs of respondent's alcohol abuse, other attorneys had expressed their concern about a possible problem.

{¶ 29} Respondent advised the board that he had consulted in October 2004 with a representative of the Ohio Lawyers Assistance Program ("OLAP"), who told him that he did not need to enter an OLAP recovery contract. Respondent stated that he did not believe it was necessary for him to completely avoid alcohol, but he also reported that he had cut back on alcohol at his doctor's recommendation. Respondent admitted, however, that he still has "a drink or a beer before dinner, and a glass of wine with dinner, and maybe something in the evening after that."

{¶ 30} Respondent testified that with his return to public employment his financial situation is also much improved. He offered to pay $5,994 in restitution to the Morris estate and $2,000 to Bissell. Respondent contended that restitution was not necessary to Nihiser because his legal work had cost more than the advanced $500 fee, and Nihiser had retained new counsel to timely pursue his case. Because his research had shown that Ramsey's case was not actionable and had cost more than the advanced $1,500 fee, respondent also contended that Ramsey had not suffered financially.

{¶ 31} Finally, respondent submitted LaForge's testimony and numerous character letters from local judges, county commissioners, and colleagues to establish his professional competence and integrity apart from his misconduct. The board found that respondent had an excellent personal and professional reputation in

his community, a mitigating factor under BCGD Proc.Reg. 10(B)(2)(e), and that he genuinely regretted his misdeeds.

{¶ 32} Relator advocated a one-year suspension of respondent's license to practice, with the suspension stayed on conditions involving monitoring and restitution. Respondent also sought a stay of any suspension and asked for a short suspension period. Adopting the panel's report, the board recommended that respondent be suspended from the practice of law for one year, with the entire period stayed, and that he serve a two-year probation under the conditions that he (1) continue with all aspects of his treatment with Dr. Lance or another qualified psychiatrist, (2) provide quarterly psychiatric reports to relator on his progress, (3) pay $1,500 in restitution to Robin Bissell, and (4) pay $5,994 in restitution to the Morris estate.

Review

{¶ 33} We agree that respondent violated DR 1–102(A)(5), 1–104(A), 6–101(A)(3), 9–102(A), and 9–102(B)(4) and Gov.Bar R. V(4)(G), as found by the board. We are not convinced, however, that respondent is currently capable of returning to the competent and ethical practice of law. We therefore exercise our authority in disciplinary cases to independently determine the appropriate sanction, see *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, paragraph one of the syllabus, and *Mahoning Cty. Bar Assn. v. Sinclair*, 105 Ohio St.3d 65, 2004-Ohio-7014, 822 N.E.2d 360, and impose a two-year suspension, with one year stayed on the recommended conditions.

{¶ 34} Respondent is taking a series of antidepressant medications, including a prescription that is regulated for its addictive qualities. Notwithstanding this, respondent has persisted in drinking beer, wine, and perhaps even more potent alcoholic beverages that also act as depressants. More troubling still is the fact that respondent appears largely unconcerned about the perils this drug and alcohol use potentially poses to the effective representation of his clients.

{¶ 35} Under all the circumstances of this case, we share the board's unease about respondent's continued alcohol consumption. The two-year probation period suggested by the board, therefore, is warranted to ensure monitoring of respondent's medical treatment and the effect of his condition, even if it does not include alcohol abuse, on his legal practice. See Gov.Bar R. V(9). Moreover, to ensure that respondent's condition is adequately managed and that he will not again abandon his clients' interests as a result of his condition, we order that respondent serve a one-year actual suspension from the Ohio bar.

{¶ 36} Respondent is therefore suspended from the practice of law in Ohio for two years. The second year of the suspension is stayed on conditions. During the stayed suspension, respondent shall (1) continue with all aspects of his

treatment with Dr. Lance or another qualified psychiatrist, (2) provide quarterly psychiatric reports to relator on his progress, (3) pay $1,500, with interest at the judgment rate, in restitution to Robin Bissell, and (4) pay $5,994, with interest at the judgment rate, in restitution to the Morris estate. Moreover, if reinstated, respondent shall serve, as an additional condition of the stay, a two-year probation pursuant to Gov.Bar R. V(9) that includes continued monitoring of his medical treatment and monitoring of his law practice to ensure his return as a competent and ethical practitioner. If respondent violates the terms of the stay or probation, the stay shall be lifted and respondent shall serve the entire two-year actual suspension.

{¶ 37} Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

———————

Jonathan E. Coughlan, Disciplinary Counsel, Stacy Solochek Beckman, Assistant Disciplinary Counsel, and Carol A. Costa, Assistant Disciplinary Counsel, for relator.

Lynn A. Grimshaw, for respondent.