DISCIPLINARY COUNSEL *v.* PARKER.

[Cite as *Disciplinary Counsel v. Parker,*
116 Ohio St.3d 64, 2007-Ohio-5635.]

(No. 2007–1157—Submitted October 9, 2007—Decided October 25, 2007.)

———————

**Per Curiam.**

{¶ 1} Respondent, George M. Parker of Mason, Ohio, Attorney Registration No. 0046664, is admitted to the practice of law in Ohio and serves as judge of the Mason Municipal Court.

{¶ 2} The Board of Commissioners on Grievances and Discipline recommends that we suspend respondent's license to practice for 18 months, with six months stayed on conditions, based on findings that he committed numerous improper and injudicious acts in his capacity as a municipal court judge. Respondent objects to the board's recommendation, arguing that mitigating factors including his narcissistic personality disorder and his cooperation in the disciplinary process outweigh any aggravating factors and warrant a more lenient sanction under applicable precedent. On review, we agree with the board that respondent violated the Code of Judicial Conduct and the Code of Professional Responsibility. We also overrule respondent's objections and agree that the recommended sanction is appropriate.

{¶ 3} Relator, Disciplinary Counsel, charged respondent in a seven-count complaint with repeatedly failing to conform to ethical standards for judges and attorneys, specifying acts of bias, coercion, intemperance, and dishonesty in and out of the courtroom. A three-member panel of the board heard the cause, including the parties' extensive stipulations, and made findings of fact and conclusions of law, with a majority of the panel recommending the 18–month suspension and six-month stay. The board adopted virtually all the findings of misconduct and the panel's majority recommendation.

## Misconduct

{¶ 4} Respondent does not dispute that he committed the professional misconduct found by the board. He does, however, attribute the charges filed against him to political disputes between him and other municipal officials. We are aware, as was the board and its panel, that these allegations of misconduct arose in a highly charged atmosphere, in which glaring publicity underscored the differences that respondent has had with the Mason city prosecuting attorney, the Mason police chief, the Mason law director, and Mason City Council. Nevertheless, the Disciplinary Counsel's investigation raised legitimate concerns about this judge, most of which had no connection to any underlying political tension, and required formal disciplinary proceedings. As we said in another case in which charges of judicial misconduct came with countercharges of political motivation and much publicity:

{¶ 5} " 'The political context and highly publicized nature of these charges cannot distract us from the seriousness of the underlying conduct * * *.' *In re Kroger* (1997), 167 Vt. 1, 15, 702 A.2d 64. Respondent's continued pattern of misrepresentation, threats, and intemperate behavior to judges, lawyers, litigants, and court personnel is both inexcusable and detrimental to the integrity of the judiciary." *Disciplinary Counsel v. O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 51.

{¶ 6} Respondent committed 23 violations of eight judicial Canons and eight violations of three Disciplinary Rules. The extent of his wrongdoing is represented by the following table:

| Canon/Rule | Counts in Which Violations Occurred |
| --- | --- |
| *Canon 1:* A judge shall uphold the integrity and independence of the judiciary | 2, 3, and 5 |
| *Canon 2:* A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary | 1, 2, 3, 4, 5, 6, and 7 |
| *Canon 3(B)(3):* A judge shall require order and decorum in proceedings before the judge | 3 |

| | |
|---|---|
| *Canon 3(B)(4):* A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control | 1, 3, 6, and 7 |
| *Canon 3(B)(7):* A judge shall not initiate, receive, permit, or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending or impending proceeding | 2 and 3 |
| *Canon 3(B)(8):* A judge shall dispose of all judicial matters promptly, efficiently, and fairly and comply with guidelines set forth in the Rules of Superintendence for the Courts of Ohio | 1 |
| *Canon 3(E)(1)(a):* A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including where the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding | 2 |
| *Canon 4:* A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities | 1, 3, 5, and 6 |
| *DR 1–102(A)(4):* A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation | 5 |
| *DR 1–102(A)(5):* A lawyer shall not engage in conduct that is prejudicial to the administration of justice | 1, 2, 3, 4, 5, and 6 |
| *DR 1–102(A)(6):* A lawyer shall not engage in conduct that adversely reflects on the lawyer's fitness to practice law | 5 |

## *Count I—Respondent Jailed a Gallery Spectator for Contempt without Cause*

{¶ 7} During November 2003, a woman attended respondent's courtroom to watch her daughter's probation-violation hearing. She sat in the gallery listening as respondent lectured her daughter from the bench about drug abuse. The woman raised her hand, and respondent trained his attention on her in an erratic departure from his remarks.

{¶ 8} Respondent emphatically told the woman to leave the courtroom. When the woman protested slightly, respondent told her to "just leave" and that he had "heard enough" out of her. He then threatened to put her in jail "in [her] daughter's place" if she did not "[j]ust get up and leave." The woman started to leave the courtroom, muttering, "I can't believe this," but respondent called her back and immediately found her in contempt of court. Respondent sentenced the woman to 24 hours in jail, and officers took her away in handcuffs.

{¶ 9} The measured and even-handed administration of justice is central to our judicial system. Respondent stained the integrity of that system with his intemperate, unreasonable, and vindictive decision to eject this spectator from the courtroom and jail her for contempt. Accord *O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 33–40; *Disciplinary Counsel v. Cox*, 113 Ohio St.3d 48, 2007-Ohio-979, 862 N.E.2d 514, ¶ 41. By abusing his power to punish contempt, respondent violated Canons 2, 3(B)(4) and (8), and 4, and DR 1–102(A)(5).

*Count II—Respondent Improperly Presided over a Defendant's Plea
and Sentencing after Participating in the Defendant's Arrest*

{¶ 10} In April 2003, respondent accepted a defendant's guilty plea and passed sentence even though he had been present for the defendant's arrest. The month before, respondent had signed a search warrant for the defendant's apartment and then accompanied an officer to the apartment complex, where officers executed the warrant in an early morning raid. Respondent did not go into the apartment, but he saw the defendant as the officers put him in a cruiser in handcuffs, and the officers confirmed that they had confiscated stolen property from his apartment. Respondent rode with an officer to the Warren County Jail and signed the defendant's commitment order. Some five weeks later, respondent presided over the defendant's guilty plea and sentencing.

{¶ 11} By participating in this defendant's arrest, respondent impermissibly crossed the line between law enforcement and the judiciary, establishing strong evidence of an actual bias. He then exacerbated an already irreparably tainted situation by failing to disqualify himself from proceedings involving the defendant. In fact, respondent presided over the defendant's plea and sentencing even after the defendant apologized to respondent for making him spend several hours at his apartment "that morning" and defense counsel's reminder that respondent had signed the search warrant that led to the defendant's arrest.

{¶ 12} Respondent's conduct cast grave doubt on his ability to act as an impartial arbiter and violated Canon 3(E)(*l*)(a). Accord *Disciplinary Counsel v. Medley* (2001), 93 Ohio St.3d 474, 476–477, 756 N.E.2d 104. His ex parte communication with the defendant violated Canon 3(B)(7). By failing to show the integrity and independence that promotes public confidence in the judiciary, respondent also violated Canons 1 and 2, as well as DR 1–102(A)(5).

*Count III—Respondent Attempted to Coerce Plea
Agreements in Two Criminal Cases*

{¶ 13} While presiding over an October 2003 jury trial in a domestic-violence case, respondent recessed the jury, stepped down from the bench, and told defense counsel that the prosecutor was "about ready to offer" a plea and that the defense counsel was "about ready to take it." The prosecutor, however, had not previously offered a plea deal to the defendant.

{¶ 14} After respondent left the courtroom, the prosecutor told defense counsel that he would agree to a fourth-degree-misdemeanor plea, but he would not offer a minor-misdemeanor plea. When respondent returned to the bench, he learned of the prosecutor's refusal to offer a minor-misdemeanor plea. Respondent resumed the trial but stopped it again after about 15 minutes and ordered counsel and the arresting officer into chambers.

{¶ 15} Respondent demanded an explanation in chambers. He challenged the prosecutor and officer, asking whether they were "listening to the same trial that [he was] listening to" and whether they knew they were "watching an acquittal." When the officer told respondent that he was unwilling to agree to a minor-misdemeanor plea, respondent lost his composure and ordered everyone except the arresting officer out of his chambers.

{¶ 16} Alone with the officer in chambers, respondent tried ex parte to persuade the officer to agree to the lesser minor-misdemeanor charge. Respondent was visibly irritated, according to the officer, and was acting short-tempered and agitated. Respondent slammed his hands down in frustration when he did not get the answers he wanted about the plea. In the end, the officer did not relent, and the defendant was acquitted.

{¶ 17} Strong-arm measures to coerce a plea agreement necessarily compromise a defendant's right to trial or a prosecutor's discretion and are antithetical to a fair and balanced criminal justice system. *O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 7. Judicial advocacy is also forbidden:

{¶ 18} " 'The judge may not * * * materially assist one party at the expense of the other. Such advocacy creates the appearance, and perhaps the reality, of partiality on the part of the judge. This, in turn, erodes public confidence in the fairness of the judiciary and undermines the faith in the judicial process that is a necessary component of republican democracy.' *In re Complaint Against White* (2002), 264 Neb. 740, 752, 651 N.W.2d 551. Judicial advocacy through ex parte communications therefore also warrants discipline. *Disciplinary Counsel v. Ferreri* (2000), 88 Ohio St.3d 456, 727 N.E.2d 908." Id. at ¶ 13.

{¶ 19} Respondent also tried to coerce a plea in a second case. The defendant, a pregnant woman, was charged with fifth-degree felony theft of a credit card and misdemeanor possession of drug paraphernalia. At a scheduled preliminary hearing in May 2003, the prosecutor rejected respondent's proposal that he offer the defendant a misdemeanor plea and insisted that the case remain a felony. On her counsel's advice, because her lawyer expected that the grand jury would not indict, the defendant then signed a waiver of her right to a preliminary hearing.

{¶ 20} Upon the defendant's waiver of preliminary hearing, Crim.R. 5(B)(1) required respondent to order her bound over to the court of common pleas. Respondent instead rejected the waiver, apparently because he wanted to "help" the woman through her pregnancy and could not "in good conscience" allow the defendant's counsel to have the case bound over to common pleas court. Respondent then held a preliminary hearing and ordered the prosecution to produce evidence showing probable cause as to the charged felony.

{¶ 21} Respondent concluded from the evidence that the state had not met its burden of proof and told the prosecution that the defendant was going to stand

trial on a first-degree misdemeanor of misuse of credit cards and fourth-degree misdemeanor of possession of drug paraphernalia. Respondent then pressed defense counsel to have his client plead guilty to a misdemeanor, advising him perfunctorily that the court would sentence the defendant to a long time in jail. At that point, the prosecution moved to dismiss the charges for direct present-ment to the grand jury. Respondent denied the motion and ordered the prosecutor to refile the charge as a misdemeanor. The prosecutor reluctantly complied, and the defendant ultimately pleaded guilty to a first-degree misde-meanor theft charge.

{¶ 22} In both of the preceding examples, respondent predetermined the outcome of a case and actively worked to produce that outcome. His actions compromised the integrity, impartiality, and independence of the judiciary and thereby violated Canons 1, 2, 3(B)(4), and 4. In his ex parte and unprofessional attempts to pressure the arresting officer, respondent also violated Canons 3(B)(3) and 3(B)(7). Respondent further engaged in conduct " 'that would appear to an objective observer to be unjudicial and prejudicial to the public esteem for the judicial office' " and therefore "acted in a manner prejudicial to the adminis-tration of justice, as prohibited by DR 1–102(A)(5)." *O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 27, quoting *Cleveland Bar Assn. v. Cleary* (2001), 93 Ohio St.3d 191, 206, 754 N.E.2d 235.

### *Count IV—Respondent Mistreated a Victim of Domestic Violence*

{¶ 23} In March 2004, respondent presided over an arraignment in a domestic-violence case. The victim appeared at the proceeding and asked the prosecutor to drop the charges against her husband. The prosecutor refused, and respon-dent denied defense counsel's motion to dismiss. After recessing court to allow the parties to resolve how to proceed in the case, respondent insisted on having the victim's facial injuries photographed.

{¶ 24} Respondent persisted in having the victim's picture taken even after the prosecutor offered the defendant a plea to a misdemeanor for disorderly conduct. In open court, defense counsel and the victim objected to the photographing, but respondent simply directed defense counsel to make a record of his objection. Respondent ordered the victim to stand in front of his bench facing the gallery and to pull back her hair so that a probation officer could take her picture with a cell phone.

{¶ 25} Respondent's remarks are documented in the court audio record:

{¶ 26} Respondent (to the victim): "Stand over here, move over here (inaudi-ble). Now I can remember what I saw. I can remember what I saw here today. Turn around, and we're gonna get some pictures of the side of your head."

{¶ 27} Victim: "Do I have to? I mean—"

{¶ 28} Respondent: "Yes, you have to. This is not your lawyer, he's the lawyer for your husband. Turn your head."

{¶ 29} Defense Counsel: "Your honor, we're objecting to this—"

{¶ 30} Respondent: "I hear ya."

{¶ 31} Defense Counsel: "I don't think—I don't think the court should take an active part in selecting any evidence."

{¶ 32} Respondent: "Make your record."

{¶ 33} Defense Counsel: "Especially when a woman comes to court and asks the court to dismiss the case."

{¶ 34} Respondent: "Make your record. Are you finished?"

{¶ 35} In addition to this harassment, respondent displayed a bias against the defendant in open court. Responding to defense counsel's arguments for dismissal based on the defendant's background, respondent mused: "[S]o that means he's entitled to beat his wife? * * * Or pushing and shoving, and leaving numerous scratches on his wife. I mean, she had a reason for calling 911 * * *." And when the victim, pleading with respondent to dismiss, said that the defendant had never attacked her before, respondent quipped: "Oh yeah? Which is all the more reason for me not to let this be dismissed, because if it's never happened before, we'll make sure it never happens again."

{¶ 36} " '[D]iscourtesy * * * on the part of a judge is particularly egregious because it undermines respect for the law in a most insidious manner. * * * [A] litigant who is subjected to rude and insensitive treatment is left without recourse. Whether the litigant wins or loses, the end result is an irreparable loss of respect for the system that tolerates such behavior.' " *O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 37, quoting *In re Kellam* (Me.1986), 503 A.2d 1308, 1312. Respondent's boorish treatment of this victim and demonstrated bias against her alleged attacker violated Canon 2 and DR 1–102(A)(5).

### Count V—Respondent Abused the 911 Emergency Response System

{¶ 37} In May 2003, counsel appearing for pretrial and trial in a criminal prosecution discovered that the defendant had not been transported to the courthouse. An acting judge suggested that counsel consult respondent. Respondent had earlier signed a conveyance order for the defendant, but the defendant had been left in jail, apparently by order of the Mason police chief because of a dispute with the sheriff over whose duty it was to transport inmates.

{¶ 38} The prosecutor and defense counsel heatedly debated the problem in respondent's chambers, but contrary to respondent's recollection, neither used a profane word other than defense counsel's reference to the situation as "bullshit." Defense counsel informed respondent that the police department had refused to

transport the defendant, and he wanted the case against his client dismissed. The prosecutor objected.

{¶ 39} Respondent decided to dial 911, apparently because it was after normal business hours and he thought no one at the police station would answer any other line. He advised the dispatcher that the call was not an emergency and asked for a police officer to report to his chambers. Respondent ordered the responding officer to transport the defendant, but the officer refused, saying that he could not disobey the police chief. Respondent then ordered the defendant released on his own recognizance, continuing the case.

{¶ 40} Several days later, a newspaper article detailed respondent's use of the 911 emergency response system to have a police officer sent to his chambers. To fend off any criticism or charges of wrongdoing, respondent called defense counsel at home and asked for a written account of the incident, suggesting that the account adhere to respondent's recollection of the incident. Neither the defense counsel nor the prosecutor agreed with respondent's exculpatory version of what happened that day in his chambers. Respondent has since offered varying and inconsistent stories, including the categorically false explanation that he called 911 at the prosecutor's direction and the preposterous claim that he called 911 to make a record of the in-chambers discussion, knowing that 911 calls are recorded.

{¶ 41} Respondent abused the 911 system by calling police to respond to a nonemergency. He then tried to deflect responsibility for the illicit use onto another lawyer by lying and using the influence of his judicial office. Respondent's actions were unprofessional, injudicious, and dishonest. He thereby violated Canons 1, 2, and 4 and DR 1–102(A)(4), 1–102(A)(5), and 1–102(A)(6).

*Count VI—Respondent Inexplicably Telephoned a Defendant's Alleged Drug Dealer in Open Court*

{¶ 42} In April 2004, respondent presided over a hearing in which a woman had been charged with marijuana use in violation of her probation. The woman pleaded no contest to the violation in open court. In a bizarre scene, respondent obtained from the woman the name of the man who allegedly sold her the marijuana and had his clerk call the man during the hearing. Respondent put the call on his speakerphone, and the courtroom heard their conversation, including respondent's later remarks:

{¶ 43} Respondent: "Hi, is this Chad? Hi, is this—Hi is this Chad?"

{¶ 44} Voice: "Yes it is."

{¶ 45} Respondent: "Uh Chad, this is somebody who understands you're selling drugs to people. Uh, Chad, they're gonna getcha buddy. Stop selling drugs if you are. If not, sorry about the call. Have a good day."

{¶ 46} Respondent (to the defendant): "If somebody like me can think of that, imagine what the other people in the government will do. They'll find him. You don't need to be around him. You better not be selling drugs or giving drugs to anybody else. Continue your probation. Go home. Have a good day."

{¶ 47} Respondent claimed that he called Chad in an effort to impress upon the woman the gravity of her situation, but his theatrics had no place in the courtroom. Respondent's outrageous telephone call generated whispering and commotion far more distracting than the supposedly contumacious conduct for which he jailed the woman in Count I for 24 hours. And much as he did to the victim in Count IV, respondent again inexcusably humiliated the defendant. She left his courtroom visibly upset.

{¶ 48} With his unprofessional and undignified treatment of this defendant, respondent severely undermined public confidence in the integrity of the bench. He thereby violated Canons 2, 3(B)(4), and 4, as well as DR 1–102(A)(5).

### Count VII—Respondent Repeatedly Mistreated Defendants and Other Participants in Court Proceedings

{¶ 49} Between 2003 and 2005, respondent routinely mistreated those who appeared before him. In addition to the victims in Counts I, IV, and VI, many other persons suffered from respondent's inappropriate, unprofessional, and sometimes inexplicably odd orders or actions in open court.

{¶ 50} On one occasion, respondent asked a teenage defendant, who was Jewish, why he was attending a Catholic high school. At other times, respondent forced defendants accused of alcohol-related offenses to admit in open court that they were alcoholics. Respondent also ordered such defendants to pull out and throw away imaginary car keys or to pretend to put an imaginary alcohol demon in a headlock.

{¶ 51} In one of his strangest antics, respondent refused during trial to return the walking cane of a defendant who had been accused of using the cane to damage a vehicle. The defendant had to ask for assistance from his counsel to leave the witness box and return to counsel table. Respondent also characterized the defendant on the record as a "frequent flyer" familiar with court proceedings and as "snake-bit mean."

{¶ 52} Respondent, however, did not limit his harangues to defendants. He insulted the prosecutor in a drunk-driving case who legitimately questioned his basis for suppressing the results of a horizontal-gaze nystagmus test. Respondent replied that he could not answer her question, stating, "[I]f I had to explain it to you, I doubt you'd understand it. The record speaks for itself on that matter."

{¶ 53} Respondent repeatedly insulted one victim/witness advocate, admonishing her on one occasion not to speak directly to him. The advocate had asked whether a domestic-violence victim could be excused from the courtroom. Respondent excused the victim, but then called the prosecuting attorney to the bench and warned him that the advocate would be expelled the next time she spoke to him. Respondent explained that only lawyers were allowed to address him. Another time, respondent facetiously mused in open court that he did not have to worry about making mistakes during proceedings because if he did, the advocate would "run and tell the newspaper." Respondent also disparaged the advocate as being a "random person in the courtroom" and having "no business giving anyone advice."

{¶ 54} Finally, in one of his most egregious blunders, respondent insisted on learning from a victim of domestic violence whether she "forgave" the defendant, her husband. Respondent delayed sentencing in the case to pressure the victim into answering this intrusive question despite her reluctance and fear of reprisal from her husband or the court. In the end, the victim could truthfully say only that she was "working on" forgiving her husband and left the courtroom distraught.

{¶ 55} These are examples of conduct that judges should avoid, especially because the Code of Judicial Conduct requires judges to be "patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity." Canon 3(B)(4). Judges may chastise defendants for wrongdoing in court. But with his unprofessional, undignified, discourteous, insensitive, and injudicious conduct in these cases, respondent again undermined public confidence in the judiciary. He thereby violated Canons 2 and 3(B)(4).

Sanction

{¶ 56} In determining the appropriate sanction to impose for respondent's violations of the Code of Judicial Conduct and Disciplinary Rules in Counts I through VII, " 'we consider the duties violated, respondent's mental state, the injury caused, the existence of aggravating or mitigating circumstances, and applicable precedent.' " *Disciplinary Counsel v. Kaup*, 102 Ohio St.3d 29, 2004-Ohio-1525, 806 N.E.2d 513, ¶ 11, quoting *Disciplinary Counsel v. Evans* (2000), 89 Ohio St.3d 497, 501, 733 N.E.2d 609; *Medley*, 93 Ohio St.3d at 477, 756 N.E.2d 104. We weigh the aggravating and mitigating factors to decide whether to be lenient or stringent in our disposition. See Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 57} Respondent has intentionally violated duties owed to the public, the judiciary, and the legal system by ignoring accepted standards of judicial

behavior. He has coerced and attempted to coerce pleas from some criminal defendants and humiliated many others. He has harassed and humiliated victims of domestic violence and acted inappropriately toward court personnel, law enforcement, counsel, and a gallery spectator. He even misused a public service in his capacity as judge.

{¶ 58} Rather than deny these ethical breaches, respondent's objections focus on the last two considerations that we use to sanction misconduct: the aggravating and mitigating factors and the applicable precedent. He argues that the mitigating factors and our precedent justify a full stay of the recommended 18–month suspension. Respondent advocates the full stay, under the recommended conditions, to commence as soon as he produces a medical opinion establishing his ability to practice law within acceptable standards of competence, ethics, and professionalism.

{¶ 59} Respondent contends that in addition to the mitigating evidence of his untarnished disciplinary record and his good character and professional achievements, see BCGD Proc.Reg. 10(B)(2)(a) and (e), the record also shows that his misconduct resulted from a mental disability and that he cooperated, to the extent his disability allowed, during the disciplinary proceedings. See BCGD Proc.Reg. 10(B)(2)(d) and (g). Respondent further contends that although some aggravating evidence may exist—a dishonest motive, pattern of misconduct, multiple offenses, and submission of false or deceptive statements, BCGD Proc. Reg. 10(B)(1)(b), (c), (d), and (f)—the weight of these factors is diminished because they are symptomatic of his mental disability. Under these circumstances, respondent concludes, case law favors extending the recommended stay of suspension.

#### Respondent's Narcissistic Personality Disorder Does Not Qualify as Mitigating under BCGD Proc.Reg. 10(B)(2)(g).

{¶ 60} For a mental disability to qualify as mitigating under BCGD Proc.Reg. 10(B)(2)(g), the record must contain the following:

{¶ 61} "(i) A diagnosis of a * * * mental disability by a qualified health care professional * * *;

{¶ 62} "(ii) A determination that * * * mental disability contributed to cause the misconduct;

{¶ 63} "(iii) * * * [I]n the event of mental disability, a sustained period of successful treatment;

{¶ 64} "(iv) A prognosis from a qualified health care professional * * * that the attorney will be able to return to competent, ethical professional practice under specified conditions."

{¶ 65} Respondent proved that he has a mental disability for the purpose of BCGD Proc.Reg. 10(B)(2)(g)(i). Douglas Beech, M.D., a certified forensic psychiatrist, examined respondent as an independent expert. In an October 2006 report, Dr. Beech diagnosed respondent with narcissistic personality disorder ("NPD"). As background for his diagnosis, Dr. Beech explained:

{¶ 66} "In order to understand the diagnosis of personality disorder, it is helpful to define personality. Personality may be thought of as consisting of a set of personality traits: characteristic patterns of inner experience and outward behavior that are established by late adolescence and early adulthood, and that are relatively stable over time. A group of personality traits that consistently presents functional impairment or distress may be referred to as a personality disorder."

{¶ 67} In his report, Dr. Beech relied on the DSM–IV–TR, the Diagnostic and Statistical Manual of Mental Disorders with Text Revisions (4th Ed.2000) to describe the features of NPD:

{¶ 68} "A pervasive pattern of grandiosity (in fantasy or behavior), need for admiration, and lack of empathy, beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

{¶ 69} "1. has a grandiose sense of self-importance (e.g., exaggerates achievements and talents, expects to be recognized as superior without commensurate achievements)[;]

{¶ 70} "2. is preoccupied with fantasies of unlimited success, power, brilliance, beauty, or ideal love[;]

{¶ 71} "3. believes that he or she is 'special' and unique and can only be understood by, or should associate with, other special or high-status people (or institutions)[;]

{¶ 72} "4. requires excessive admiration[;]

{¶ 73} "5. has a sense of entitlement, i.e., unreasonable expectations of especially favorable treatment or automatic compliance with his or her expectations[;]

{¶ 74} "6. is interpersonally exploitative, i.e., takes advantage of others to achieve his or her own ends[;]

{¶ 75} "7. lacks empathy: is unwilling to recognize or identify with the feelings and needs of others[;]

{¶ 76} "8. is often envious of others or believes that others are envious of him or her[;]

{¶ 77} "9. shows arrogant, haughty behaviors or attitudes."

{¶ 78} Dr. Beech offered this excerpt from another psychiatry text to show some of the ways respondent's disorder applies in this case:

{¶ 79} " 'Because persons with narcissistic personality disorder have grandiose self-esteem, they are vulnerable to intense reactions when their self-image is damaged. They respond with strong feelings of hurt or anger to even small slights, rejections, defeats, or criticisms. As a result, persons with narcissistic personality disorder usually go to great lengths to avoid exposure to such experience and, when that fails, react by becoming devaluative or rageful.' " Quoting American Psychiatric Publishing Textbook of Clinical Psychiatry (4th Ed.2003).

{¶ 80} During his testimony, Dr. Beech offered no statistics on the success rate for treatment of NPD, explaining that "the vast majority of people who have this condition don't ever go into treatment because they don't think they have a problem by definition; * * * the problem is outside of themselves." But though NPD sufferers typically resist treatment, Dr. Beech placed the resistance factor on a continuum and surmised that not all patients would necessarily refuse psychiatric help. He acknowledged that seeking help was a "favorable prognostic sign"—"if a person is willing, that says that they are at the end that's probably modifiable, because it says there's an opening there of looking at one's self."

{¶ 81} Respondent also proved that his personality disorder "contributed to cause" his misconduct for the purpose of BCGD Proc.Reg. 10(B)(2)(g)(ii). According to Dr. Beech, narcissistic personality traits are not unusual in successful professionals, but in cases like respondent's "[i]t is the accompanying distress of functional impairment that distinguishes a disorder, not the mere presence of symptoms or features." Dr. Beech testified to the impaired judgment and distress illustrated by respondent's behavior patterns, which he thought the complaint fairly characterized as follows: "Respondent consistently humiliates, degrades, and disrespects persons appearing in open court, including attorneys, law enforcement, witnesses, victims, defendants, and victim-witness advocates." Dr. Beech reported that respondent's condition was not a mental illness under the definition in R.C. 5122.01(A); [1] but he confirmed that respondent's NPD is a chronic personality disorder and presents "ongoing vulnerabilities in his ability to consistently practice in a safe and responsible manner." Because those vulnerabilities manifested themselves in respondent's day-to-day activities as a judge, Dr. Beech concluded that NPD in part caused respondent to commit the misconduct in this case.

{¶ 82} Dr. Beech's examination and diagnosis, however, did not permit him to also conclude to a reasonable degree of medical certainty either that respondent (1) had experienced a sustained period of successful treatment or (2) could or

---

1. Under R.C. 5122.01(A), "mental illness" means "a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life."

would be able to return to the competent, ethical, and professional practice of law, as required by BCGD Proc.Reg. 10(B)(2)(g)(iii) and (iv). Dr. Beech instead reiterated that NPD is not readily amenable to treatment. He believed that respondent could improve with treatment because he is capable of constructive behavioral modifications. As of the time of his report and testimony, however, Dr. Beech could not register a medical opinion that respondent's condition had improved to the extent that he no longer posed a risk to the public as a practitioner or judge.

{¶ 83} Notwithstanding Dr. Beech's lack of confidence, respondent urges us to accept his NPD as mitigating under BCGD Proc.Reg. 10(B)(2)(g)(iii) and (iv). He first insists that a noticeable improvement in his demeanor, ability to answer questions straightforwardly, and insight into his behavior by the last day of the three-day hearing (eight months after the first day), after he had attended nine counseling sessions for his NPD with his psychologist, is enough to show a sustained period of successful treatment. Respondent also argues that Dr. Beech's testimony acknowledging that respondent could improve with treatment and "may have already" is enough to show a prognosis from a qualified health-care professional that respondent "will be able" to return to competent, ethical, professional practice.

{¶ 84} We reject both arguments for basically the same reason. We have never allowed a lawyer who has committed misconduct because of a mental disability to continue to practice without the assurance of a qualified health-care professional, in conformity with BCGD Proc.Reg. 10(B)(2)(g)(iv), that the lawyer is able to practice safely. Evidence suggesting that the lawyer *may* be able to practice competently and in accordance with ethical and professional standards is not nearly enough. Our cases show that a lawyer whose diagnosed mental disability has contributed to his misconduct must provide competent proof that the disabling symptoms are fully managed *currently*. E.g., *Disciplinary Counsel v. Bowman*, 110 Ohio St.3d 480, 2006-Ohio-4333, 854 N.E.2d 480, ¶ 38; *Disciplinary Counsel v. Shaw*, 110 Ohio St.3d 122, 2006-Ohio-3821, 851 N.E.2d 487, ¶ 33; and *Columbus Bar Assn. v. McCorkle*, 105 Ohio St.3d 430, 2005-Ohio-2588, 828 N.E.2d 99, ¶ 11.

{¶ 85} No such evidence exists in this record. We therefore cannot attribute significant mitigating effect to respondent's mental disability under BCGD Proc. Reg. 10(B)(2)(g). *Bowman*, 110 Ohio St.3d 480, 2006-Ohio-4333, 854 N.E.2d 480, ¶ 25 ("To have significant mitigating effect under BCGD Proc.Reg. 10(B)(2)(g)," a lawyer must prove all four elements in the rule).

{¶ 86} This is not to say, however, that we find no mitigation in respondent's recent treatment and apparent improvement. BCGD Proc.Reg. 10(B) authorizes consideration of "all relevant factors," including those specified, and as respon-

dent observes, we frequently do weigh concerns not specified there. See, e.g., *Disciplinary Counsel v. Scacchetti*, 114 Ohio St.3d 36, 2007-Ohio-2713, 867 N.E.2d 830 (two-year suspension partially stayed, in part because of prescription-drug-addicted lawyer's renewed commitment to recovery after relapse, but not stayed in full, to ensure further treatment and lawyer's preparedness for practice); and *Columbus Bar Assn. v. Winkfield*, 107 Ohio St.3d 360, 2006-Ohio-6, 839 N.E.2d 924 (lawyer's improvement from severe mental disability warranted indefinite suspension, rather than usual disbarment, for misappropriating client funds, to allow treatment and possibility of lawyer's competent, ethical, and professional practice in the future). Continued treatment will establish respondent's sincerity in addressing his mental disability.

Respondent's NPD Does Not Excuse His Inconsistent and Untrue
Explanations or Alleviate Their Aggravating Effect

{¶ 87} Although respondent entered into many stipulations of underlying facts and the parties stipulated that respondent cooperated in the disciplinary proceedings, respondent also impeded the investigation and fact-finding process by providing numerous inconsistent and untrue accounts of the underlying events. Examples include the following:

{¶ 88} 1. During the investigation of Count I, respondent explained that he found the gallery spectator in contempt because she waived her hand in defiance of his order and used profanity. The courtroom videotape shows that the spectator did neither.

{¶ 89} 2. During the investigation of Count II, respondent reported that he had accompanied officers to execute the search warrant at the request of one of the officers. He later stipulated that he had actually asked to accompany the officers. At his deposition, respondent testified that he had declined an officer's offer to drop him off at home before the officers served the warrant. At the hearing, respondent acknowledged the stipulation but disavowed that version of the incident.

{¶ 90} Also as to Count II, respondent stipulated and then confirmed at the hearing that he had seen the defendant in handcuffs when officers brought the defendant out of the apartment. At his deposition, however, respondent denied having seen the defendant then. This testimony bolstered respondent's story that he did not recognize the defendant when he accepted the defendant's guilty plea and passed sentence.

{¶ 91} 3. During the investigation of Count III, respondent reported that before he had advised the courtroom that the defendant was "about ready" to take a plea deal from the prosecutor, defense counsel had moved for acquittal, and that both counsel then agreed in chambers to resolve the case with a plea to

a lesser charge. The audio record of the proceedings, however, confirms that the defense did not move for acquittal. To dispel this inconsistency, respondent testified at his deposition and the hearing that he had instead responded to a nonverbal cue from the prosecutor that the prosecutor was willing to offer a plea. The prosecutor denied having given any such indication.

{¶ 92} 4. During the investigation of Count IV, respondent reported that the domestic-violence victim had agreed to be photographed. The audio record of the proceedings confirms that she did not. In his deposition, respondent first claimed not to remember whether the victim assented but later reiterated that she did agree. He also stated that he saw the assent in her eyes.

{¶ 93} 5. During the investigation of Count V, respondent reported that the dispute between counsel had escalated in his chambers and that he had called 911 because he had hoped to "end the fray" by having a "bailiff" explain the failure to transport the defendant. Respondent also reported that the prosecutor had suggested that he call 911 to locate an officer. Respondent repeated versions of these stories during the hearing, but both counsel recalled that respondent had dialed 911 without any prompting.

{¶ 94} 6. During the investigation of Count VII, respondent reported that he had taken the walking cane from the defendant to test the defendant's credibility as to his actual need for a cane. At his deposition, however, respondent claimed that he took the cane out of concern for the gallery's safety.

{¶ 95} Respondent also contradicted and contested his own factual stipulations while testifying. For instance, respondent stipulated as to Count II that he had asked one of the officers whether he could ride along to execute the search warrant. But he reneged while testifying, saying, "I don't believe that's the way that the communication occurred."

{¶ 96} In another example, respondent stipulated that the gallery spectator in Count I had said, "I don't believe this," before being cited for contempt. He testified, however, that the spectator had said, "This is fucking bullshit." When relator's counsel asked him to explain the inconsistency, the following colloquy occurred:

{¶ 97} Counsel: "And you would admit today that your admission in the stipulations is completely inconsistent with your answer * * *."

{¶ 98} Respondent: "No."

{¶ 99} Counsel: "Why don't you explain to us how they are consistent."

{¶ 100} Respondent: "I know what I remember her saying. She said something different."

{¶ 101} Counsel: "Tell us what she said."

{¶ 102} Respondent: "She said the words that are written in the answer. That's what I believed she said."

{¶ 103} "* * *"

{¶ 104} Counsel: "As you sit here today, do you recall that [the spectator] said 'This is fucking bullshit'?"

{¶ 105} Respondent: "Well, that would be my recollection of what occurred. However, she has said something different. Either way, in my estimate, it doesn't make a difference because she wasn't a participant in the proceedings, had no right to speak, was exhibiting the behavior that had to be met with the appropriate response."

{¶ 106} Counsel: "That's not what I asked you, Judge. As you sit here today, do you recollect that [the spectator] said that, 'This is fucking bullshit'?"

{¶ 107} Respondent: "That's the way I remember her inappropriate interaction."

{¶ 108} Respondent also evaded questions while testifying. At one point during the first day of hearing, relator's counsel asked respondent if he thought that the pregnant defendant in Count III would continue to use drugs if she were bound over to common pleas court and no longer in his jurisdiction. Respondent answered: "It depends. As judge or as the person George Parker? I mean, I absolutely care about her as a human being about whether she was doing drugs before, after, or during the time that she might be subject to my authority and jurisdiction as a judge—" Only when the panel chairperson interrupted to request a "yes" or "no" answer did respondent admit his concern about the defendant's continued drug use if she were bound over.

{¶ 109} At his deposition, respondent testified to nonsense to deflect responsibility. Asked why he had called a defendant "snake-bit mean," respondent said that he had made the derogatory remark to describe the defendant as an alcoholic. Asked why he told a defendant accused of shoplifting to wipe off her sticky hands with a tissue, saying that the gesture would serve as "a little hypnotism," respondent replied that he actually referred to "hypnotism" as a way of saying that they were putting the matter to rest. Resorting to gibberish, respondent testified:

{¶ 110} Respondent: "And hypnotism or hypnosis or—has, in Webster's dictionary, at least four definitions, and [one] of them means to put the matter to rest."

{¶ 111} Counsel: "So by you—you're telling me today then that your use of the word 'hypnotism' was to inform the defense attorney that we're putting this matter to rest?"

{¶ 112} Respondent: (Nodding head.)

{¶ 113} Counsel: "It wasn't the use of the word hypnotism—"

{¶ 114} Respondent: "No."

{¶ 115} Counsel: "—in the sense of you're hypnotizing a defendant?"

{¶ 116} Respondent: "No."

{¶ 117} The submission of false or deceptive statements in response to an investigation of professional misconduct is an aggravating factor and also manifests dishonesty and a failure to acknowledge wrongdoing. Respondent urges us to overlook these transgressions, arguing that they are symptomatic of his NPD. As relator argues, however, the record contains no evidence that respondent's condition precludes him from recognizing truth. Indeed, respondent could not raise this defense without necessarily disqualifying himself from the practice of law in any capacity.

{¶ 118} As the board observed, respondent's evasiveness and lack of candor are deeply troubling:

{¶ 119} "Respondent's effort to distort in order to justify his misconduct is an aggravating factor. It emphasizes Respondent's ongoing inability to accept the wrongfulness of his conduct. That lack of insight, unless corrected, portends a comparable inability to modify his behavior.

{¶ 120} "Respondent's tactics of misrepresentation, fabrication, and obstruction in the face of discipline are unacceptable for any attorney, let alone a judge. ' "[A] judge who misrepresents the truth tarnishes the dignity and the honor of his or her office" because "[t]ruth and honesty lie at the heart of the judicial system, and judges who conduct themselves in an untruthful manner contradict this most basic ideal." ' " Quoting *O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 27, quoting *In re Inquiry Concerning McCormick* (Iowa 2002), 639 N.W.2d 12, 16.

### An 18–Month Suspension with a Six–Month Stay Is Appropriate

{¶ 121} Respondent's improprieties and dishonesty require an actual suspension from the practice of law. *O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 52. In *O'Neill,* we suspended the common pleas judge's license to practice for two years, staying the last year on conditions, including that the judge seek mental-health counseling, for judicial misconduct at least as pervasive as misconduct that respondent has committed. In determining the length of that suspension and conditions of the stay, we began with the premise that the sanction must be sufficient to protect the public from further ethical infractions. Id. at ¶ 53.

{¶ 122} Protective measures are required here. This is not a case in which a judge committed misconduct without jeopardizing interests at stake in his courtroom. See, e.g., *Disciplinary Counsel v. Ault,* 110 Ohio St.3d 207, 2006-Ohio-4247, 852 N.E.2d 727; *Disciplinary Counsel v. Connor,* 105 Ohio St.3d 100,

2004-Ohio-6902, 822 N.E.2d 1235 (judges' criminal acts stemming from drug or alcohol dependence violated professional standards, but addictions did not impair their judicial performance). As we have seen, the public remains at serious risk if respondent is permitted to remain on the bench unchecked.

{¶ 123} Respondent insists that his case most resembles *Disciplinary Counsel v. Karto* (2002), 94 Ohio St.3d 109, 760 N.E.2d 412, in which we issued a six-month license suspension to a common pleas judge, the only one in the jurisdiction, who abused his contempt power and demonstrated bias in the courtroom. That judge initiated contempt proceedings against a county official for disobeying one of his orders and then testified as a witness and argued against the official in open court. The judge then resumed the bench to declare the official in contempt but refused to issue a judgment imposing sentence, thereby precluding any appeal. In another case, the judge found a woman in contempt without any official record to document the process. In a third contempt case, the judge offered to suspend contempt proceedings against a county employee if she resigned from her job.

{¶ 124} Like respondent, the judge in *Karto* used his contempt power to intimidate, casting doubt on his impartiality. He also demonstrated actual bias much like respondent did. Judge Karto urged the prosecuting attorney to press felony charges against a defendant and his brother and conducted a detention hearing in the absence of the boys' counsel, directing the boys themselves to question the state's witness. But as outrageous as was the misconduct in *Karto*, it is exceeded in depth and scope by respondent's improprieties.

{¶ 125} More analogous is *Disciplinary Counsel v. Medley*, 104 Ohio St.3d 251, 2004-Ohio-6402, 819 N.E.2d 273. In *Medley*, a municipal court judge compromised the integrity of the judiciary by accepting a defendant's guilty pleas to three criminal charges in exchange for the dismissal of a fourth charge without the presence of any counsel whatsoever. The judge also showed actual bias in favor of a local political party official by repeatedly issuing ex parte orders to prevent a creditor from collecting on a default judgment against the official. Finally, the judge facilitated collections in small-claims court by granting default judgments against debtors who failed to answer complaints and by issuing warrants for the debtors' arrests if they did not appear as ordered and pay.

{¶ 126} A prior disciplinary record exacerbated the situation in *Medley*. The judge had already been publicly reprimanded for creating the appearance of bias by giving a defendant a ride after her arrest and then presiding over her case. We suspended the judge's license for 18 months, staying the last six months. Again, however, even if that judge's previous disciplinary record is taken into account, the number and severity of respondent's improprieties surpass those in *Medley*.

{¶ 127} As signified by our many references to *O'Neill,* we find the sanction imposed in that case most instructive, although we temper that disposition to account for respondent's having entered treatment for the personality disorder that contributed to his misconduct. As the board noted:

{¶ 128} "Further, respondent's prevarications and excuses indicate a failure to fully acknowledge responsibility for his conduct and a lack of insight as to its cause and ramifications.

{¶ 129} "It is of particular significance * * * that Respondent's NPD predisposes him to perceive events in a distorted and self-serving manner. For example, Dr. Beech testified that a 'vast majority of people who have [NPD] don't ever go to treatment because they don't think they have a problem'[;] they think the problem is 'outside of themselves.' Such a perception of life's events, whether on or off the bench, whether related to Respondent's personal or professional life, is chronic and inherently difficult to alter. However, Respondent has taken the step towards treatment, and should be given credit for that effort * * *. Additionally, while the [board] recognizes that Respondent worked in a highly public and stressful environment, such external forces will often exist, whether Respondent is a judge or a private practitioner. For these reasons we believe that ongoing psychotherapy or other appropriate psychiatric treatment is essential to provide Respondent with the tools he needs to practice in a competent, ethical and professional manner."

{¶ 130} We suspend respondent from the practice of law in Ohio for 18 months and, pursuant to Gov.Jud.R. III(7)(A), concurrently suspend him, without pay, from his office as judge of the Mason Municipal Court. We stay, however, the last six months of the suspension on the conditions that respondent (1) participate in psychotherapy with a qualified health-care professional of his choice at a frequency and duration determined by that health-care professional, (2) submit his health-care professional's certification that respondent has undergone a substantial period of successful psychotherapy or other appropriate treatment and the professional's opinion, to a reasonable degree of medical certainty, that respondent is currently able to practice law in a competent, ethical, and professional manner, (3) maintain a contract with Ohio Lawyers Assistance Program until the stay takes effect and for the following four years, and (4) commit no further misconduct. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Joseph M. Caligiuri, Assistant Disciplinary Counsel, for relator.

84

Montgomery, Rennie & Jonson, L.P.A., and George D. Jonson, for respondent.