[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Gaul*, Slip Opinion No. 2023-Ohio-4751.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2023-OHIO-4751

DISCIPLINARY COUNSEL *v.* GAUL.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Gaul*, Slip Opinion No. 2023-Ohio-4751.]

*Judges—Misconduct—Violations of the Code of Judicial Conduct and the Rules of Professional Conduct—One-year suspension and immediate suspension from judicial office without pay for duration of disciplinary suspension.*

(No. 2022-1515—Submitted April 18, 2023—Decided December 29, 2023.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2021-039.

_____

**KENNEDY, C.J.**

{¶ 1} Respondent, Daniel Gaul, of Cleveland, Ohio, Attorney Registration No. 0009721, was admitted to the practice of law in Ohio in 1981.  Since 1991, he has served as a judge on the Cuyahoga County Common Pleas Court.

**{¶ 2}** In 2010, based on findings that Gaul had made unnecessary and highly prejudicial remarks against a defendant in a criminal case and had misused the Amber Alert system to locate a missing witness in the case, we suspended Gaul from the practice of law for six months, with all six months conditionally stayed. *See Disciplinary Counsel v. Gaul*, 127 Ohio St.3d 16, 2010-Ohio-4831, 936 N.E.2d 28, ¶ 52-73, 80.

**{¶ 3}** In an April 2022 amended complaint, relator, disciplinary counsel, charged Gaul with eight counts of judicial misconduct, which arose from seven criminal matters and one civil-stalking-protection-order case over which Gaul had presided. The complaint alleged that Gaul had committed 26 violations of the Code of Judicial Conduct and 5 violations of the Rules of Professional Conduct.

**{¶ 4}** The alleged misconduct occurred over a period of more than five years and falls into six categories: (1) coercing pleas (Counts 1 and 8), (2) aggressive questioning of a criminal defendant (Count 2), (3) making demeaning comments to a criminal defendant and other persons in the courtroom (Counts 3 and 4), (4) abusing the prestige of judicial office to advance the personal interests of others (Count 5), (5) refusing to grant release from confinement and disregarding appellate-court orders (Count 6), and (6) abusing contempt power (Count 7).

**{¶ 5}** The parties entered into 179 stipulations of fact and submitted 83 stipulated exhibits. Six witnesses, including Gaul, testified at a hearing conducted by a three-member panel of the Board of Professional Conduct. In his posthearing brief, Gaul stipulated that he had committed a total of ten rule violations under five of the eight counts of relator's amended complaint.

**{¶ 6}** Based on the parties' stipulations and the evidence adduced at the hearing, the panel found that Gaul had committed all 31 of the charged rule violations. After weighing the applicable aggravating and mitigating factors, the panel recommended that Gaul be suspended from the practice of law for one year.

The board adopted the panel's findings of fact, conclusions of law, and recommended sanction and further recommended that pursuant to Gov.Jud.R. III(7)(A), Gaul be immediately suspended from judicial office without pay for the duration of his disciplinary suspension.

**{¶ 7}** Gaul raises four objections to the board's report and recommendation. In his first two objections, he disputes the board's finding of certain aggravating factors. In his third objection, he disputes the board's findings that he engaged in misconduct regarding the nonstipulated rule violations. And in his fourth objection, he disagrees with the board's recommended sanction.

**{¶ 8}** Based on clear and convincing evidence in the record, we sustain Gaul's first objection, overrule his second and fourth objections, and overrule in part and sustain in part his third objection. After considering the board's report and Gaul's objections, we suspend Gaul from the practice of law for one year, with no portion of the suspension stayed, and immediately suspend Gaul from judicial office without pay for the duration of the suspension.

## I. PRELIMINARY MATTERS

### A. Alleged Rules Violations in This Case

**{¶ 9}** Gaul was charged with 31 rule violations, which were alleged to have occurred over an approximate five-year period. The following chart lists the rule violations charged under each count and client matter and the violations to which Gaul stipulated:

| Client Matter | Charged Rule Violations |
|---|---|
| Count 1—The Heard Matter | ➢ Jud.Cond.R. 1.2—Stipulated<br>➢ Jud.Cond.R. 2.2<br>➢ Jud.Cond.R. 2.6(B)—Stipulated<br>➢ Jud.Cond.R. 2.8(B)—Stipulated<br>➢ Jud.Cond.R. 2.11(A) |

| | |
|---|---|
| | ➢ Prof.Cond.R. 8.4(d) |
| Count 2—The W.S. Matter | ➢ Jud.Cond.R. 1.2 |
| | ➢ Jud.Cond.R. 2.2 |
| | ➢ Jud.Cond.R. 2.11(A)(1) |
| | ➢ Prof.Cond.R. 8.4(d) |
| Count 3—The Callahan Matter | ➢ Jud.Cond.R. 1.2—Stipulated |
| | ➢ Jud.Cond.R. 2.3(B)—Stipulated |
| | ➢ Jud.Cond.R. 2.8(B)—Stipulated |
| | ➢ Jud.Cond.R. 2.11(A)(1)—Stipulated |
| Count 4—The Collins Matter | ➢ Jud.Cond.R. 1.2 |
| | ➢ Jud.Cond.R. 2.8(B)—Stipulated |
| Count 5—The Viola Matter | ➢ Jud.Cond.R. 1.2 |
| | ➢ Jud.Cond.R. 1.3 |
| Count 6—The Jackson Matter | ➢ Jud.Cond.R. 1.2 |
| | ➢ Jud.Cond.R. 2.2—Stipulated |
| | ➢ Prof.Cond.R. 8.4(d) |
| Count 7—The Smiley Matter | ➢ Jud.Cond.R. 1.2 |
| | ➢ Jud.Cond.R. 2.2 |
| | ➢ Jud.Cond.R. 2.8(B) |
| | ➢ Jud.Cond.R. 2.11(A)(1)Prof.Cond.R. 8.4(d) |
| Count 8—The Byas Matter | ➢ Jud.Cond.R. 1.2 |
| | ➢ Jud.Cond.R. 2.2 |
| | ➢ Jud.Cond.R. 2.6(B)—Stipulated |
| | ➢ Jud.Cond.R. 2.11(A) |
| | ➢ Prof.Cond.R. 8.4(d) |

**{¶ 10}** The following chart provides the text of each rule alleged to have been violated by Gaul:

| Rule Number | Rule Text |
|---|---|
| Jud.Cond.R. 1.2 | A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety. |
| Jud.Cond.R. 1.3 | A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so. |
| Jud.Cond.R. 2.2 | A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially. |
| Jud.Cond.R. 2.3(B) | A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so. |
| Jud.Cond.R. 2.6(B) | A judge may encourage parties to a proceeding and their lawyers to settle matters in dispute but shall not act in a manner that coerces any party into settlement. |
| Jud.Cond.R. 2.8(B) | A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control. |
| Jud.Cond.R. 2.11(A) | A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned. |

| Jud.Cond.R. 2.11(A)(1) | A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including [when the] judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding. |
|---|---|
| Prof.Cond.R. 8.4(d) | It is professional misconduct for a lawyer to * * * engage in conduct that is prejudicial to the administration of justice. |

### B. Gaul's Incorporated Arguments

{¶ 11} This court's rules require parties' briefs to contain arguments relevant to their positions. S.Ct.Prac.R. 16.02(B)(4). In Gaul's brief in this court, he attempts to support his third objection—i.e., his objection regarding the board's findings that he engaged in misconduct concerning the nonstipulated rule violations—by incorporating his posthearing brief by reference. In the interest of giving all of Gaul's arguments full consideration, we reluctantly consider the arguments that have been incorporated by reference, though we have no intention to do so in other cases going forward.

## II. MISCONDUCT

{¶ 12} After reviewing the record, we adopt the board's findings of misconduct regarding the stipulated rule violations. Therefore, we focus primarily on the charged rule violations that Gaul disputes, along with his objections to the board's report.

### A. Count 1—The Heard Matter

{¶ 13} The Heard matter involved Gaul's coercing no-contest pleas. In 2015, Carleton Heard was indicted for attempted murder and other crimes. Before Heard entered his no-contest pleas, Gaul gave him an ultimatum. Gaul told Heard that if he were to plead no contest, he would serve 14 years in prison, with credit for the time he had already served, and that with the exception of a firearm-

6

specification sentence, Gaul would run his sentences concurrently. On the other hand, Gaul assured Heard that if he were to take the case to trial and be convicted on all the counts, Gaul would run his sentences consecutively, resulting in an aggregate sentence of up to 42 years. Gaul also told Heard that the trial would begin immediately because the jurors were on their way to the courtroom. The transcript of the hearing reflects that neither the prosecutor nor defense counsel participated in the discussion of the terms of the plea offer.

{¶ 14} Heard accepted the plea deal proposed by Gaul and pleaded no contest to each count in the indictment. During his conversation with Heard at the sentencing hearing, Gaul harped on the fact that Heard had grown up without a father, and Gaul alluded to the Black Lives Matter movement. In the end, Gaul sentenced Heard to 14 years in prison.

{¶ 15} Heard appealed his convictions to the Eighth District Court of Appeals, which vacated his no-contest pleas and reversed the judgment of conviction, holding that Gaul's conduct had rendered Heard's no-contest pleas involuntary. *State v. Heard*, 2017-Ohio-8310, 87 N.E.3d 245, ¶ 1, 16, 19-22 (8th Dist.). The court of appeals explained: "[T]here is no question that [Gaul's] participation in the plea process could have led Heard to believe he could not get a fair trial or a fair sentence after trial." *Id.* at ¶ 19. On remand, Heard's case was assigned to a different judge and tried to a jury, which acquitted Heard of all the charges.

{¶ 16} In the Heard matter, relator charged Gaul with violating Jud.Cond.R. 1.2, 2.2, 2.6(B), 2.8(B), and 2.11(A) and Prof.Cond.R. 8.4(d). At his disciplinary hearing, Gaul was asked whether he "went too far" and abandoned his role as an impartial jurist in the Heard matter. Initially, without answering the question, Gaul highlighted his judicial experience. But he eventually admitted he had gone too far, although he denied that he had violated any conduct rules in that regard. In his posthearing brief, Gaul stipulated to violations of Jud.Cond.R. 1.2, 2.6(B), and

2.8(B). The board determined that Gaul had violated all the rules specified in the amended complaint in the Heard matter.

{¶ 17} Gaul's conduct amounted to coercing Heard into taking a plea deal wholly created by Gaul. Neither the prosecutor nor defense counsel participated in the terms of the plea deal; rather, Gaul crafted the deal himself and then used his judicial authority to coerce Heard into accepting the deal. Gaul did not merely encourage settlement of the case—he initiated the settlement, dictated its terms, and repeatedly told Heard what would happen (imposition of a lengthier prison sentence) if he were to go to trial and be convicted of the charged offenses. He also threatened to impose a trial tax by clarifying that Heard would be given a much lengthier aggregate sentence if he were to exercise his right to a jury trial.

{¶ 18} This conduct by Gaul, coupled with his inappropriate questions and comments regarding Heard's childhood and the Black Lives Matter movement show that he was not performing his duties fairly and impartially. Gaul essentially predetermined the sentences he would impose on Heard if Heard were to be convicted following a jury trial, which means that Gaul was no longer acting as an impartial and objective fact-finder and that he should have disqualified himself from the matter. Gaul's coercive conduct of threatening Heard with a lengthier sentence if he were to exercise his right to a trial, which led to a 14-year prison sentence under the plea deal and ultimately to the reversal of Heard's convictions and his acquittal following a trial, was prejudicial to the administration of justice and harmful to the judiciary as a whole. Therefore, we adopt the board's findings that Gaul violated Jud.Cond.R. 1.2, 2.2, 2.6(B), 2.8(B), and 2.11(A) and Prof.Cond.R. 8.4(d) in the Heard matter.

### B. Count 2—The W.S. Matter

{¶ 19} In the W.S. matter, Gaul improperly questioned a defendant in a criminal case following the defendant's trial testimony. In 2016, W.S. was charged with one count of felonious assault, which resulted from a fight between W.S. and

another person. During W.S.'s bench trial, Gaul asked W.S. approximately 85 questions concerning a variety of topics, many of which were not related to the felonious-assault charge. Those topics included W.S.'s consumption of alcohol, fights not related to the case, prior criminal convictions, prior juvenile charges, and a plea agreement in a misdemeanor case. Defense counsel twice objected to Gaul's off-topic questioning before Gaul stopped the questioning. Gaul found W.S. guilty of the felonious-assault charge and sentenced him to four years of community control.

{¶ 20} W.S. appealed his conviction to the Eighth District, alleging that the trial court had abused its discretion by considering inadmissible and prejudicial evidence and questioning him in a confrontational manner. The court of appeals agreed, finding that Gaul had acted with "bias and prejudice" and had abandoned his duty as an impartial fact-finder when he interrogated W.S. on matters that were not only inadmissible but wholly immaterial to the case. The court vacated W.S.'s conviction, and the case was assigned to a different judge on remand. W.S. then entered a guilty plea to misdemeanor assault and was sentenced to time already served and ordered to pay $3,500 in restitution.

{¶ 21} In the W.S. matter, relator charged Gaul with violating Jud.Cond.R. 1.2, 2.2, and 2.11(A)(1) and Prof.Cond.R. 8.4(d). At his disciplinary hearing, Gaul admitted that he had gone "too far" in his questioning of W.S., and he submitted that he stopped the questioning when defense counsel first objected to it. In his posthearing brief, Gaul argued that his improper questioning was "good faith legal error." The board determined that Gaul committed all the charged violations.

{¶ 22} Gaul's conduct in this matter was not good-faith legal error. During W.S.'s criminal trial, Gaul brought up various irrelevant topics and asked questions that had no bearing on the case. Many of those questions and W.S.'s answers to them brought inappropriate information into evidence that any reasonable judge would have realized was harmful to W.S.'s defense. And Gaul's implication that

he stopped the improper questioning when defense counsel first objected does not square with the evidence—defense counsel had to object twice before Gaul stopped the questioning. Gaul's conduct was not fair and impartial, and it did not promote confidence in the judiciary. He latched onto irrelevant and inadmissible evidence that could have warped any fact-finder's view of W.S. and his case. Gaul's extensive inappropriate questioning, which continued even after defense counsel objected to it, displayed bias and prejudice that should have resulted in Gaul disqualifying himself from the case. And Gaul's persistent improper questioning of W.S., over objection, was prejudicial to the administration of justice because Gaul was the ultimate ruler on any objections but continued his inappropriate conduct despite defense counsel's objection. Therefore, we adopt the board's findings that Gaul violated Jud.Cond.R. 1.2, 2.2, and 2.11(A)(1) and Prof.Cond.R. 8.4(d) in the W.S. matter.

### C. Count 3—The Callahan Matter

{¶ 23} In the Callahan matter, Gaul made demeaning and inappropriate comments to a defendant in a criminal case. In 2016, Demagio Callahan was charged with 18 criminal offenses relating to a shooting. Callahan elected to have two of the counts tried to Gaul, who was presiding over the case, and Gaul convicted Callahan of both of those counts. The remaining 16 counts were tried to a jury, and Callahan was acquitted of all but one of those counts. At Callahan's sentencing hearing, Gaul referred to a prior criminal case against Callahan over which Gaul had presided and implied that Callahan had "beat the rap" regarding a murder charge in that case. Gaul called Callahan a "brother," a "murderer," and a "remorseless predator." Also regarding the earlier case, Gaul stated that he would have "busted a cap" in Callahan if he had been the person "standing at the window of [Callahan's] car with a gun on [Callahan]" and that "[Callahan] wouldn't have quick drawn [him]." Gaul imposed a fine against Callahan to prevent people from

putting money into Callahan's prison account, and he sentenced Callahan to 54 months in prison.

{¶ 24} In the Callahan matter, relator charged Gaul with violating Jud.Cond.R. 1.2, 2.3(B), 2.8(B), and 2.11(A)(1). Gaul admitted at his disciplinary hearing that he "blew it" at Callahan's sentencing hearing. Relator asked Gaul whether "calling an African-American defendant a brother can have an inappropriate racial tone to it?" Gaul answered, "It may have. And it was an unfortunate use of the word at the time." When asked whether doing so was undignified and inappropriate, Gaul answered, "Yes, it can be interpreted that way." But when asked the same question again, he changed his answer to "[n]ot necessarily." Gaul stipulated to all the charged violations in the Callahan matter, and the board determined that the violations had been proved.

{¶ 25} We agree with the board's findings that Gaul's statements to Callahan "were intended to be demeaning and were based, in large part, upon [Gaul's] belief that Callahan had beaten a murder charge." Gaul's demeaning use of the word "brother" and statements referring to Callahan as a "murderer" and a "remorseless predator" indicated a lack of impartiality that should have compelled Gaul to disqualify himself from the matter. We adopt the board's findings that Gaul violated Jud.Cond.R. 1.2, 2.3(B), 2.8(B), and 2.11(A)(1) in the Callahan matter.

### D. Count 4—The Collins Matter

{¶ 26} The Collins matter involved a protection-order hearing and is the only noncriminal matter over which Gaul presided that led to disciplinary charges in this case. In 2020, Tinesha Chapman filed a petition for a civil stalking protection order against Natasha Collins. Chapman and her estranged husband, Cleveland Police Department Sergeant Michael Chapman, had two children together and were going through a divorce. Sergeant Chapman had been dating Collins, who was a Cleveland police officer, for about two years, and Collins would occasionally accompany Sergeant Chapman to Tinesha Chapman's house to pick

up or drop off the children. Tinesha Chapman alleged that Collins had harassed her during those encounters. Gaul presided over the hearing on the protective order, and during the hearing, he commented that Sergeant Chapman was "using" Collins to "screw with" Tinesha Chapman. Gaul indicated that it was Sergeant Chapman's fault that Tinesha Chapman and Collins were in court and in the positions they were in. Gaul also referred to Collins as Sergeant Chapman's "mistress" five separate times.

{¶ 27} Additionally, Sergeant Chapman was in the courtroom during the hearing, and Gaul accused him of manipulating the women and called him "Mr. Know It All." Gaul had also been aware that an internal-affairs officer from Sergeant Chapman's police department was in the courtroom at the time he made these comments. Gaul did not issue the protection order, but he warned Collins, "If there is one more text message, if there is one more encounter, if there's one more threat, if there's one more * * * picture or text message, at that point I will consider that a pattern of conduct that justifies issuance of the order." And he told Tinesha Chapman that if Collins's behavior continued, she should refile her petition and that he would then issue the order.

{¶ 28} In the Collins matter, relator charged Gaul with violating Jud.Cond.R. 1.2 and 2.8(B). At his disciplinary hearing, Gaul refused to admit that his comments about Sergeant Chapman during the protection-order hearing were demeaning. Gaul stipulated to a violation of Jud.Cond.R. 2.8(B), and the board determined that Gaul violated both Jud.Cond.R. 1.2 and 2.8(B).

{¶ 29} Gaul's improper comments in the Collins matter were beneath the dignity of the bench. His repeated labeling of Collins as a "mistress" was demeaning, as were his comments about Sergeant Chapman's purported manipulation of the women. These inappropriate remarks were not dignified, and they were not courteous to the litigants (or Sergeant Chapman). Gaul was supposed to be a neutral arbiter, but his inappropriate conduct during the hearing showed his

lack of impartiality and bias toward one party. Therefore, we adopt the board's findings that Gaul violated Jud.Cond.R. 1.2 and 2.8(B) in the Collins matter.

*E. Count 5—The Viola Matter*

**{¶ 30}** In the Viola matter, Gaul used his position as a judge in an effort to overturn a defendant's federal convictions. In 2008, Anthony L. Viola was indicted on federal charges that resulted from a mortgage-fraud investigation. A federal jury convicted him of 35 counts of fraud, and he was sentenced to 12.5 years in federal prison and ordered to pay over $2.6 million in restitution. The state of Ohio brought similar charges against him. Gaul presided over the state cases, and after a trial, a jury acquitted Viola of the charges.

**{¶ 31}** Around 2014, Viola wrote to Gaul from federal prison, requesting portions of the transcript of his state-court trial for his use in his federal appeal. From 2014 through February 2017, Gaul wrote to Viola at least three times. Each letter was on official court letterhead and was signed "Daniel Gaul, Judge." In response to Viola's request for the transcript, Gaul authorized court reporters to prepare the portions of the transcript Viola had requested and told Viola that he would provide them "at no cost in the interest of justice." Gaul ordered the county treasury pay $475 for the cost of the transcript.

**{¶ 32}** In a February 2017 letter to Viola, Gaul expressed his "feelings of regret on [Viola's] continued incarceration" and that he "had hoped that [Viola's] exoneration in [his] courtroom would have assisted [Viola] in overturing [Viola's] federal conviction." Gaul told Viola that the newly elected Cuyahoga County prosecutor might be willing to look into potential misconduct by a prosecutor who handled Viola's federal case, and he told Viola to let him know "if [he could] assist in any way." Gaul also expressed that he hoped Viola's federal convictions would be overturned. Viola's father asked Gaul for permission to forward that letter to then-attorney-general Mike DeWine, which Gaul granted. Subsequently, and

unbeknownst to Gaul, Viola attached the letter to multiple court filings in an effort to overturn his federal convictions.

**{¶ 33}** Gaul self-reported this conduct to relator, and relator charged Gaul with violating Jud.Cond.R. 1.2 and 1.3. At his disciplinary hearing, Gaul denied that his February 2017 letter supporting Gaul's efforts to overturn his convictions was an offer, as a judge, to attempt to advance Viola's interest in his federal case. But he acknowledged having sent documents to Viola that he might use to advance his interest in the federal case. The board determined that Gaul violated Jud.Cond.R. 1.2 and 1.3. In his objections to the board's report, Gaul voiced his regret that he had allowed Viola's father to forward to the attorney general the letter that supported Viola's efforts to overturn his convictions.

**{¶ 34}** Gaul's cumulative misconduct in this matter leads to the conclusion that he was using his position as a judge to advance Viola's interest in overturning his federal convictions. When Gaul provided Viola with the transcript of portions of Viola's state trial and made the county pay for it, he advanced both the personal and economic interests of Viola by providing the transcript at taxpayer expense. Additionally, Gaul's suggestion to Viola that the newly elected county prosecutor might look into misconduct by the federal prosecutor not only shows that Gaul was advancing Viola's interest in overturning his convictions but also harms the public's confidence in the independence, integrity, and impartiality of the judiciary because the suggestion questioned the integrity of the federal courts. It was not for Gaul to decide whether Viola's federal conviction was proper. When a judge questions the integrity of legal proceedings that he or she has no authority to review, that judge damages the public's faith in both the judiciary and the legal profession as a whole.

**{¶ 35}** Further, Gaul's offer to assist Viola "in any way" and his consent to the letter's being sent to the attorney general further confirms that he was advancing Viola's interest in overturning his convictions and that he harmed the

independence, integrity, and impartiality of the judiciary. As Alexander Hamilton recognized, "[t]he Executive not only dispenses the honors but holds the sword of the community. * * * The judiciary, on the contrary, has no influence over * * * the sword * * *. The complete independence of the courts of justice is peculiarly essential" to our government. The Federalist No. 78, at 464-465 (Clinton Rossiter Ed.1961). By advocating to the attorney general—an executive-branch official and the state's chief law officer, R.C. 109.02—Gaul broke the barrier separating the powers of our government and disrupted the traditional independence of the judiciary. While no measurable effect is apparent from Gaul's misconduct, the misconduct itself harms the public's confidence in the judiciary. Therefore, we adopt the board's findings that Gaul violated Jud.Cond.R. 1.2 and 1.3 in the Viola matter.

### F. Count 6—The Jackson Matter

{¶ 36} The Jackson matter involved Gaul's errors in exercising his judicial discretion, which unfortunately resulted in Anthony Jackson's prolonged incarceration. Gaul was assigned to two criminal cases in which Jackson was the defendant. In the first case, Cuyahoga C.P. No. CR-20-653683-A, Jackson was indicted on a felony charge, and he posted a $10,000 bond. A few months later, in a second case, Cuyahoga C.P. No. CR-21-656172-A, Jackson was indicted on two other felony counts. Bond in the second case was set at $25,000.

{¶ 37} After the indictment in the second case, Jackson was declared incompetent to stand trial, and Gaul ordered the sheriff to transport Jackson to a behavioral-health facility. Jackson posted bond in the second case but remained in custody pending his transportation to the behavioral-health facility. The facility determined that Jackson was competent to stand trial. Jackson then moved the trial court to release him from custody because he had posted bond in each of the cases.

{¶ 38} At a hearing on the matter, Gaul explained that it was his policy to find a defendant to be in violation of his bond if an indictment is issued against the

defendant while the defendant is out of jail on bond. Gaul's reasoning was that the subsequent indictment indicated that there was probable cause to believe that the defendant had engaged in further criminal activity. Gaul also raised concerns about Jackson's threatening and violent behavior while at the behavioral-health facility. Gaul, reading from a psychiatric report, noted that Jackson had made multiple threats to facility staff, screamed and yelled at them, fought them, broke a door, and had to be physically restrained. Gaul cited this behavior as one of the reasons he was not going to release Jackson on bond.

{¶ 39} Jackson's attorney alerted Gaul that Jackson had posted bond in both of his cases and that neither bond had been revoked. Gaul explained that because Jackson had been at the behavioral-health facility, he had not revoked Jackson's bond in the first case but that he would do so that day. Gaul followed through, revoking Jackson's bond in the first case, and he thereafter denied Jackson's motion for release.

{¶ 40} Jackson appealed to the Eighth District, and the appellate court remanded the matter to Gaul "for the limited purpose of issuing findings pursuant to R.C. 2937.222(B), which requires the trial court to state whether it found by clear and convincing evidence" three factors justifying the denial of bond. The first factor is whether "the proof is evident or the presumption great that the accused committed the [charged] offense." R.C. 2937.222(B). The second factor is whether "the accused poses a substantial risk of serious physical harm to any person or to the community." *Id.* And the third factor is whether "no release conditions will reasonably assure the safety of that person and the community." *Id.*

{¶ 41} On remand, Gaul held another hearing, during which he recited all three of the R.C. 2937.222(B) factors and stated that he had found each one. Gaul also noted that Jackson had been referred to the behavioral-health facility for competency restoration and that his cases involved "acts of physical violence," and Gaul said that he was "incorporating by reference" any transcripts of prior hearings

16

in the cases. After announcing his findings under R.C. 2937.222(B), Gaul allowed both sides to be heard. The prosecutor added, regarding the second factor under R.C. 2937.222(B)—whether the accused poses a substantial risk of serious physical harm to any person or to the community—"that both of the[] events [in the cases] include[d] attacks on residents in the same building [in] which [Jackson] lived." Regarding the third factor, the prosecutor argued that giving Jackson "any sort of bond condition" would not keep the people in that building safe.

{¶ 42} When the matter returned to the court of appeals, the appellate court held that Gaul's decision had violated Jackson's constitutional guarantee to consideration for bail. *State v. Jackson*, 8th Dist. Cuyahoga No. 110621, 2021-Ohio-4320, ¶ 51. The court ordered Gaul to reinstate Jackson's bond and to release him. *Id.* at ¶ 52. On remand, Gaul ordered Jackson to be released.

{¶ 43} In the Jackson matter, relator charged Gaul with violating Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d). Gaul stipulated to violating Jud.Cond.R. 2.2. At his disciplinary hearing, Gaul admitted that he had made a legal error, explaining that he had thought he could take judicial notice of Jackson's other indictment and the incompetency finding for purposes of R.C. 2937.222. The board determined that Gaul's conduct violated Jud.Cond.R. 1.2 and Prof.Cond.R. 8.4(d).

{¶ 44} This court has long held that "a mere mistake in the exercise of judicial discretion by a judge is not and should never be the cause or subject of a disciplinary proceeding under" the judicial-conduct rules. *Mahoning Cty. Bar Assn. v. Franko*, 168 Ohio St. 17, 30, 151 N.E.2d 17 (1958); *see also In re Rome*, 218 Kan. 198, 205, 542 P.2d 676 (1975) ("It is well settled, of course, that a judge is not subject to discipline for exercising his discretion in performing a judicial act, even if his decision be erroneous"). Instead, "[t]he remedy for mistakes of law or fact in individual cases is by appeal, or certiorari, or other proper proceeding. A judge has a right to be wrong so far as any discipline by [a court is] concerned

except as his decisions may be reversed or writs sustained." *In re Judges of Mun. Court of Cedar Rapids*, 256 Iowa 1135, 1136, 130 N.W.2d 553 (1964). When faced with a situation similar to that here, the Massachusetts Supreme Judicial Court aptly explained:

> When the action or decision of a judge involving the exercise of his judgment and his discretion is questioned or challenged as contrary to law, there are legally constituted avenues to test such action short of an initial appeal to the Supreme Judicial Court to invoke its extraordinary powers of supervision or its powers to discipline. Extraordinary remedies are provided for appellate review forthwith of allegedly excessive bail or other judicial orders which have resulted in the incarceration of a defendant. To invoke the disciplinary power of this court against a judge as a substitute for appellate review would establish a practice dangerous to the independence of the judiciary and equally dangerous to the public's constitutional right to an independent judiciary.

*In re Troy*, 364 Mass. 15, 40, 306 N.E.2d 203 (1973).

{¶ 45} While we are tasked with analyzing numerous allegations of misconduct in this case, we cannot let the mound of violations obscure our vision such that we blindly treat all of Gaul's judicial acts as being worthy of disciplinary action. We must carefully comb through Gaul's conduct and identify his exercises of judicial discretion that would be or were better dealt with through the appellate process and that do not amount to violations of the Code of Judicial Conduct or Rules of Professional Conduct.

{¶ 46} Gaul's conduct in the Jackson matter does not amount to a violation of Jud.Cond.R. 1.2 or Prof.Cond.R. 8.4(d). While Gaul did not mention

R.C. 2937.222(B) during the initial bond hearing or perform a substantial analysis under the statute's factors, Gaul's reading of the psychiatric report concerning Jackson's threatening and violent behavior and explanation that that behavior was a reason he would not be releasing Jackson on bond shows that he exercised his judicial discretion in determining whether to release Jackson into the public. And while our purpose here is not to determine whether Gaul's judicial actions were correct—indeed, the court of appeals already answered that question—it is plausible that Jackson's threats and violence were relevant to one or more of the R.C. 2937.222(B) factors but that Gaul's legal error prevented him from making those findings on the record.

{¶ 47} Further, during the hearing following the court of appeals' remand for Gaul to issue findings under R.C. 2937.222(B), Gaul stated that he had found all the factors under the statute, following the court of appeals' mandate in a basic, technical sense. But the court of appeals then determined that Gaul had erred in his bare-bones findings and in his failure to consider record evidence. *Jackson*, 2021-Ohio-4320, at ¶ 40-41, 44, 46-49. Gaul admits that he committed legal errors when he attempted to take judicial notice of Jackson's other indictments and the incompetency finding for purposes of R.C. 2937.222. These legal mistakes, despite their needing to be corrected on appeal, do not warrant disciplinary action.

{¶ 48} Finally, Gaul's decision to make his R.C. 2937.222(B) findings before hearing from the parties was a procedural error concerning the structure of the hearing. Gaul did not silence either party on the matter; he merely went out of order. Gaul's discretionary actions in the Jackson matter did not fail to promote public confidence in the independence, integrity, and impartiality of the judiciary, *see* Jud.Cond.R. 1.2, and Gaul did not engage in conduct prejudicial to the administration of justice, *see* Prof.Cond.R. 8.4(d).

{¶ 49} This is not to "imply that judges should be immune from criticism arising out of their exercise of judicial discretion and judgment," *Troy*, 364 Mass.

at 40, 306 N.E.2d 203.  But if every mistake made by a judge in exercising his judicial discretion prejudiced the administration of justice or jeopardized public confidence in the judiciary and required disciplinary proceedings in this court, then appellate review would have grave consequences to any judge who committed error in exercising his or her judicial discretion.

{¶ 50} Based on Gaul's stipulation, we adopt the board's finding that he violated Jud.Cond.R. 2.2.  But because the remainder of Gaul's conduct at issue in the Jackson matter falls on the side of judicial discretion rather than behavior warranting disciplinary action, we find that Gaul did not violate Jud.Cond.R. 1.2 or Prof.Cond.R. 8.4(d) in that matter.

### G.  Count 7—The Smiley Matter

{¶ 51} In the Smiley matter, Gaul quarreled with a criminal defendant during the defendant's arraignment.  In 2021, Arthur Smiley was indicted on two counts of robbery.  He appeared before Gaul by videoconferencing for arraignment on the charges.  Because he had two cases pending before another judge, the case was set to be automatically transferred to that judge following the arraignment.

{¶ 52} From the start of the arraignment, the interaction between Gaul and Smiley was not cordial, to say the least.  Gaul determined that he was going to set a $25,000 surety bond in Smiley's case.  In response, Smiley said, "Thank you." From that point, the colloquy devolved into apathetic quips by Smiley that appeared to increasingly irritate Gaul.  Smiley continued to express indifference regarding the arraignment because he would be held in jail for other cases anyway.  Gaul referred to Smiley, who is black, as "my brother" and told him, "This isn't the drive-through window at Burger King, my friend.  You don't get it your way."

{¶ 53} As a result of the exchange, Gaul announced that he was raising Smiley's bond to $100,000.  Smiley told Gaul that he was making himself "look stupid * * * as a judge" by raising the bond when Smiley could not be released because he was being held in his other cases.  Gaul responded by finding Smiley in

contempt of court and sentencing him to 30 days in jail for the contempt matter and placing a holder on him so that he could not be released until he returned to Gaul's courtroom.

{¶ 54} Toward the end of the arraignment, Gaul retracted his decision to increase Smiley's bond and reset the bond at $25,000. Smiley appealed the contempt finding to the Eighth District, and the court of appeals reversed the ruling and remanded the matter to Gaul for him to make findings of fact to allow the appellate court to determine whether he had abused his discretion. *State v. Smiley*, 8th Dist. Cuyahoga No. 110878, 2022-Ohio-1242, ¶ 12-13. On remand, Gaul suggested to Smiley's counsel that he would dismiss the contempt charge in exchange for an apology from Smiley. Smiley apologized, and the contempt charge was thereafter dismissed.

{¶ 55} In the Smiley matter, relator charged Gaul with violating Jud.Cond.R. 1.2, 2.2, 2.8(B), and 2.11(A)(1) and Prof.Cond.R. 8.4(d). At his disciplinary hearing, Gaul testified that he had not held Smiley in contempt and never signed an entry finding Smiley in contempt. But after relator showed Gaul the contempt entry, which Gaul had signed, he responded, "So my thought was that the contempt would not start until his other time had concluded, and I specifically put a hold on him so that we would have a hearing." The board determined that Gaul violated Jud.Cond.R. 1.2, 2.2, 2.8(B), and 2.11(A)(1) and Prof.Cond.R. 8.4(d).

{¶ 56} Judges—especially trial-court judges—deal with people of varying tempers on a near-daily basis, and a judge's encountering a difficult person does not excuse the judge's duty to exercise fair and impartial judgment and to treat that person with patience, courtesy, and dignity. Gaul's interaction with Smiley did little to promote the public's confidence in the integrity and impartiality of the judiciary, because Gaul continued to engage with Smiley even though the main purpose of the hearing—the setting of bond—had been fulfilled. Gaul could have

stopped interacting with Smiley after he set bond, but he chose not to. The evidence shows that as the arraignment continued, Gaul became increasingly irritated by Smiley's cavalier attitude.

{¶ 57} Conduct such as that exhibited by Smiley during the arraignment might inflame the passions of an ordinary person so as to cause the person to respond with equal vigor, but judges are not ordinary. Rather, they are held to the highest standards of professional behavior. *Disciplinary Counsel v. Carr*, 170 Ohio St.3d 401, 2022-Ohio-3633, 214 N.E.3d 496, ¶ 86, citing *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 57. Ohioans expect patience from their judges. By stepping up (or down) to Smiley's level and engaging with Smiley when he did not need to do so, Gaul prolonged a bad situation and made it worse. Gaul's continued interaction with Smiley ultimately led to his finding Smiley in contempt. That unnecessary interaction demonstrated that Gaul's role as an impartial arbiter in the matter had ended, resulting in prejudice to Smiley. In other words, but for Gaul's continued engagement with Smiley, the contempt finding, although later reversed, would never have happened.

{¶ 58} We recognize that a court of law is often a place for disagreement and argument, whether between the parties to a case or a party and the judge. But judges must recognize when they need to control such a situation and take the high road. Here, Gaul did not do so. We adopt the board's findings that Gaul violated Jud.Cond.R. 1.2, 2.2, 2.8(B), and 2.11(A)(1) and Prof.Cond.R. 8.4(d) in the Smiley matter.

### H. Count 8—The Byas Matter

{¶ 59} The Byas matter involved another instance of Gaul's coercing no-contest pleas. In 2018, De'Ontay Byas appeared before Gaul and pleaded guilty in multiple criminal cases ("the 2018 cases"). Gaul sentenced Byas in the 2018 cases to time already served and released him on community control. In 2019, while Byas was on community control, he was arrested and charged with other offenses,

which resulted in two separate matters—one in state court ("the first 2019 case") and one that had the potential to become, and ultimately did become, a federal case ("the second 2019 case").

{¶ 60} Byas initially had a separate attorney for each of the 2019 cases. Timothy Gauntner, a court-appointed attorney, represented Byas in the first 2019 case. James Ingalls was retained by Byas to represent him in the second 2019 case.

{¶ 61} Gaul presided over the first 2019 case, in which Byas pleaded not guilty at his arraignment. At a pretrial hearing in that case, attorneys Gauntner and Ingalls both appeared on Byas's behalf. During the hearing, Gaul told Byas that he had a proposed resolution for the first 2019 case. Gaul proposed that if Byas were to enter a plea in that case, he would sentence him to a total of two years in prison for the 2018 cases and the first 2019 case. After learning that Byas's family was in the courtroom, Gaul explained to Byas that he was facing seven and one-half years in prison in the 2018 cases alone and more than seven years in prison in the first 2019 case. Gaul also explained to Byas that even if he were to be found not guilty of all the charges in the first 2019 case, he would still be deemed a probation violator in the 2018 cases and that probable cause was sufficient to find a probation violation.

{¶ 62} Gaul then asked Byas: "Would you like to enter a plea on the new case, or would you like to go forward with the probation violation?" At that point, Ingalls asked to consult with Byas, and Gaul granted that request. Gauntner then informed Gaul that Byas no longer wanted Gauntner to represent him. Gaul responded:

> Mr. Byas, let me explain something to you. I have been considerate
> to you, and I have been considerate to your family.
> * * *

You either are going to resolve this case today with two years, *or you're going to be, in two minutes, a probation violator*, and you're going to be sent down for three years on the first probation violation.

This has nothing to do with Mr. Gauntner. And your disrespectful behavior to Mr. Gauntner is offensive to my Court.

I have treated you with decency and respect. For you to pretend that this is about Mr. Gauntner, who is one of the finest attorneys in Cuyahoga County, is disgraceful. It's flipping the script and blaming somebody else. You're not going to get a new attorney. But what *you're going to get is a consecutive period of incarceration* if you're probation violated, and then eventually convicted of the new case; okay?

Do not come into my courtroom and attempt to blame your attorney or the system. It's not about us. We're here because of your behavior.

Now, you have reached the very limit of my patience. I don't have to have this conversation with you. I, *right now, could sentence you to six years in a state penal institution* and recuse myself from the new case, and send it to a different judge who could give you an additional six years.

(Emphasis added.) Byas interjected, "I plead guilty your Honor." Gaul then stated, "You see. What I know, and I say this to the attorneys all the time, they can't talk to you like I just talked to you because you want to fire them, they're prejudiced, bigoted. It has nothing to do with that whatsoever. It's all about your behavior."

{¶ 63} Ingalls was worried that a particular conviction under the plea agreement might affect the second 2019 case, and he asked whether the prosecutor

would reduce that charge to a lesser offense. Gaul then proposed that Gauntner withdraw as Byas's counsel so that Gaul could appoint Ingalls to represent Byas. After Gauntner withdrew and Gaul appointed Ingalls, Gaul said that Byas was "pointing fingers" at his attorneys and told him the following:

> I'll have more to say later if you do enter a plea, but your behavior is aggravating. It harms the community. Look at what you are putting your mother, grandmother, and girlfriend through.
>
> * * *
>
> [Y]our behavior is self destructive. You might as well stand up and start banging your head against that wall. You're killing yourself.
>
> * * *
>
> Do you want to enter a plea or not?

Byas responded, "Yes, sir." Gaul then said, "What I am going to do, [Ingalls], I'll accept a no contest plea. And, [Ingalls], you'll make a record, and I'll find him guilty and sentence him out today as indicated; correct?" Gaul reminded Byas that even if he were to receive not-guilty verdicts at trial in the first 2019 case, Gaul would still revoke his community control and sentence him to prison.

{¶ 64} Finally, Gaul conducted the Crim.R. 11 plea colloquy with Byas and then asked him, "How do you plead? You're going to plead no contest. Remember that. How do you plead?" Byas pleaded no contest, as Gaul had instructed. Although Gaul instructed Byas to plead no contest, he did not advise him of the effect of a no-contest plea, as required by Crim.R. 11(C)(2). Gaul found Byas guilty and sentenced him to two years in prison.

**{¶ 65}** Byas appealed his convictions to the Eighth District, arguing that Gaul had coerced his no-contest pleas and had failed to advise him of the effect of the pleas. *State v. Byas*, 8th Dist. Cuyahoga No. 110157, 2021-Ohio-3924, ¶ 24, 47. The court of appeals sustained Byas's assignments of error, vacated his no-contest pleas, and remanded the case to the trial court. *Id.* at ¶ 45, 57, 59-60. The court denied Byas's motion to reassign his case to another judge on remand. Gaul later recused himself from the first 2019 case, citing the pendency of relator's disciplinary complaint against him, which charged him with misconduct in the Byas matter.

**{¶ 66}** In the Byas matter, relator charged Gaul with violating Jud.Cond.R. 1.2, 2.2, 2.6(B), and 2.11(A) and Prof.Cond.R. 8.4(d). At his disciplinary hearing, Gaul admitted that he had predetermined that Byas had violated his community control. In his posthearing brief, Gaul acknowledged that he should not have "indicated on the record that Byas could be a probation violator in a matter of minutes." He also conceded that "his statements on the record [gave] rise to an implication that he coerced a settlement," though he has denied that that was his intent. He nonetheless stipulated that his conduct violated Jud.Cond.R. 2.6(B), and the board determined that he committed all the charged rule violations.

**{¶ 67}** Gaul made several missteps in the Byas matter. For example, he failed to provide Byas with the notice required by Crim.R. 11(C)(2) during the colloquy. Gaul argues that any errors of fact or law—including his "inadvertent" failure to comply with Crim.R. 11(C)—were made in good faith. He notes that Comment 3 to Jud.Cond.R. 2.2 provides, "When applying and interpreting the law, a judge sometimes may make good-faith errors of fact or law. Errors of this kind do not violate this rule." We agree with that comment, as explained in our analysis above regarding the Jackson matter. However, Gaul's committing good-faith errors of fact or law is not the problem here. The problem is his coercing pleas, and moreover, his establishing his own terms for the pleas.

**{¶ 68}** At the time of Gaul's misconduct in the Byas matter, the Eighth District had already issued its decision that Gaul had coerced no-contest pleas in the Heard matter. *See Heard*, 2017-Ohio-8310, 87 N.E.3d 245, at ¶ 16-24. But that did not deter Gaul from providing another criminal defendant, Byas, with an ultimatum: if Byas did not accept the plea offer that day, Gaul would swiftly find him in violation of his community control and impose a seven-and-one-half-year sentence for those violations alone. Gaul openly admitted during his disciplinary hearing that he had predetermined that Byas had violated his community control. And the record shows that Gaul had not by then afforded Byas even the most basic due-process protections. *See State v. Miller*, 42 Ohio St.2d 102, 104, 326 N.E.2d 259 (1975) (recognizing that among other things, an alleged probation violator is entitled to preliminary and final revocation hearings, written notice of the claimed violations, disclosure of the evidence against him, and an opportunity to be heard and present witnesses and evidence).

**{¶ 69}** As in the Heard matter, Gaul's conduct supports findings that he (1) failed to promote public confidence in the independence, integrity, and impartiality of the judiciary, *see* Jud.Cond.R. 1.2, (2) failed to perform all duties of his office fairly and impartially, *see* Jud.Cond.R. 2.2, and (3) engaged in conduct prejudicial to the administration of justice, *see* Prof.Cond.R. 8.4(d). Further, Gaul's premature finding of probable cause that Byas had violated his community control would lead a reasonable observer to conclude that his impartiality might reasonably be questioned, a violation of Jud.Cond.R. 2.11(A) that required his recusal. Therefore, we adopt the board's findings and conclude that Gaul violated Jud.Cond.R. 1.2, 2.2, 2.6(B), and 2.11(A) and Prof.Cond.R. 8.4(d) in the Byas matter.

### III. AGGRAVATING AND MITIGATING FACTORS

**{¶ 70}** When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the

aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 71} The parties did not stipulate to any aggravating or mitigating factors. As for aggravating factors, the board found that Gaul (1) had received prior discipline, (2) acted with a dishonest or selfish motive, (3) engaged in a pattern of misconduct involving multiple counts with similar and reoccurring violations, (4) committed multiple offenses, (5) refused to acknowledge the wrongfulness of his conduct, and (6) caused harm to vulnerable victims. *See* Gov.Bar R. V(13)(B)(1), (2), (3), (4), (7), and (8). As for mitigating factors, the board found that Gaul (1) made full and free disclosure to the board and exhibited a cooperative attitude toward the disciplinary proceedings and (2) presented extensive evidence of his good character and reputation, which included 40 letters from attorneys, court personnel, a judge, a former judge, and others. *See* Gov.Bar R. V(13)(C)(4) and (5).

## IV. OBJECTIONS AND SANCTION

{¶ 72} Gaul offers four objections to the board's report and recommendation: (1) the board erred in finding the aggravating factor that he acted with a dishonest or selfish motive, (2) the board erred in finding the aggravating factor that he refused to acknowledge the wrongfulness of his conduct, (3) the board erred in determining that he engaged in misconduct regarding the nonstipulated rule violations, and (4) the board erred in recommending a one-year actual suspension from the practice of law instead of a fully stayed one-year suspension.

### A. *Gaul Did Not Act with a Dishonest or Selfish Motive*

{¶ 73} In his first objection, Gaul argues that the board erred in finding the aggravating factor that he acted with a dishonest or selfish motive, *see* Gov.Bar R. V(13)(B)(2). We agree. We can quickly dispense with the question whether Gaul acted with a dishonest motive. Relator does not argue that Gaul did so, and the

record is devoid of any facts that would support a dishonest-motive finding. Rather, the issue here is whether Gaul acted with a selfish motive. He did not.

{¶ 74} The board determined that Gaul acted with a dishonest or selfish motive based on its view of *Disciplinary Counsel v. Bachman*, 163 Ohio St.3d 195, 2020-Ohio-6732, 168 N.E.3d 1178. In that case, Bachman, a former magistrate, had stopped a hearing and left the bench to locate a woman whose momentary scream in the hallway outside his courtroom had been audible in the courtroom. *Id.* at ¶ 2, 23-24. Bachman caught up with the woman, escorted her to his courtroom, summarily held her in direct contempt of court, and sentenced her to three days in jail. *Id.* at ¶ 2. When she objected, Bachman increased the sanction to ten days in jail. *Id.* Bachman stipulated to all the charged misconduct and to five mitigating factors. *See id.* at ¶ 3, 12, 14. Nevertheless, we found the aggravating factor that Bachman had acted with a dishonest or selfish motive, *see id.* at ¶ 14, but we did not elaborate on why.

{¶ 75} Here, the board assumed that this court found the aggravating factor of a dishonest or selfish motive in *Bachman* based on Bachman's abuse of the contempt power and unlawful incarceration of a person. The board reasoned that because, in its view, the defendants in the Heard, Jackson, and Smiley matters had been "unlawfully incarcerated," a finding that Gaul acted with a dishonest or selfish motive was proper. But we do not read *Bachman* as establishing such a presumption or endorse such a presumption here.

{¶ 76} Although a judge's conduct resulting in a person's unlawful incarceration may lead to a finding that the judge acted with a dishonest or selfish motive, it is important to remember that we decide disciplinary cases in light of their "unique facts and circumstances," Gov.Bar R. V(13)(A); *see also Toledo Bar Assn. v. Hales*, 120 Ohio St.3d 340, 2008-Ohio-6201, 899 N.E.2d 130, ¶ 21. The Rules for the Government of the Bar concerning aggravating factors in disciplinary cases include the attorney's having had "a selfish or dishonest motive," Gov.Bar R.

V(13)(B)(2), but the rules do not define the term "selfish." "Selfish" means "concerned excessively or exclusively with oneself." *Webster's Third New International Dictionary* 2060 (1993).

{¶ 77} Since we typically consider the "dishonest or selfish motive" aggravating factor, Gov.Bar R. V(13)(B)(2), to include *either* dishonest *or* selfish motive, we tend not to separate the terms "dishonest" and "selfish" when we state that we have found that factor. Looking to our caselaw, a few cases illuminate conduct that supports a finding of the "selfish" factor. That conduct includes a judge's continually sending inappropriate messages to a court reporter and asking the court reporter out on dates, *Disciplinary Counsel v. Berry*, 166 Ohio St.3d 112, 2021-Ohio-3864, 182 N.E.3d 1184, ¶ 4-11, 15, 20, *order modified by* 165 Ohio St.3d 1500, 2022-Ohio-22, 179 N.E.3d 111, a judge's failure to accurately report his ownership interest in a building on financial-disclosure statements and failing to disclose his relationship with attorneys who were tenants of that building when they appeared before him, *Disciplinary Counsel v. Burge*, 157 Ohio St.3d 203, 2019-Ohio-3205, 134 N.E.3d 153, ¶ 15, 29, 32-33, and a judge's being found guilty of soliciting prostitution and falsifying a court record, *Ohio State Bar Assn. v. Jacob*, 150 Ohio St.3d 162, 2017-Ohio-2733, 80 N.E.3d 440, ¶ 1, 4, 12, 21.

{¶ 78} A review of our caselaw shows that, although not a prerequisite to our finding a selfish motive, conduct undertaken for a personal advantage is a strong indicator of a selfish motive. In *Berry*, the judge sought personal gain by pursuing the court reporter in hopes of securing dates with her. *Id.* at ¶ 6, 8. In *Burge*, the judge personally benefited by avoiding required reporting of financial interests and by not disqualifying himself from cases involving attorneys who were his tenants. *Id.* at ¶ 5, 15. And in *Jacob*, the judge was not only dishonest in falsifying a court record, *id.* at ¶ 6-8, but he engaged in continual selfish conduct by paying a masseuse for sex and soliciting sex from two other women, *id.* at ¶ 5.

{¶ 79} We do not find the indicator of selfish motivation—i.e., conduct undertaken for a personal advantage—to be present here, and we fail to see how Gaul's conduct otherwise supports a finding that he acted with a selfish motive. While we have determined that Gaul committed numerous rule violations, there is no proof in the record that he engaged in misconduct for his personal advantage or that he was excessively or exclusively concerned with himself. None of Gaul's conduct came close to what we have previously found to support a finding of a selfish motive. We must be careful to not confuse the effects of misconduct with the motive for the misconduct.

{¶ 80} Relator argues that Gaul "aggrandize[d] power to himself because he act[ed] out of emotion, not careful deliberation" and that he "selfishly placed his reputation over the judiciary's." But we do not make such a leap. It is true, as evinced by his numerous violations of the judicial- and professional-conduct rules, that Gaul lacked fairness and impartiality and that he harmed the public's confidence in the judiciary. But the record does not show that Gaul intended to benefit himself through his misconduct or that he engaged in the misconduct for reputational gain. Therefore, we sustain Gaul's first objection to the board's report and find that he did not act with a dishonest or selfish motive, *see* Gov.Bar R. V(13)(B)(2).

*B. Gaul Refused to Acknowledge the Wrongfulness of His Conduct*

{¶ 81} In his second objection to the board's report, Gaul argues that the board erred in finding the aggravating factor that he refused to acknowledge the wrongfulness of his conduct, *see* Gov.Bar R. V(13)(B)(7). Gaul argues that because he stipulated to the facts and exhibits underlying the complaint in this case, made full and free disclosures to the board, acknowledged that he had acted inappropriately, and eventually stipulated to multiple rule violations, he cannot be found to have failed to acknowledge the wrongful nature of his conduct. He further asserts that the board's finding of that aggravating factor is the disciplinary

equivalent of a "trial tax" that punishes him for not admitting that he committed all the charged misconduct. *See, e.g.*, *State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, 80 N.E.3d 431, ¶ 8 (lead opinion), quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (" 'To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort' "). For the following reasons, these arguments are without merit.

{¶ 82} As noted above, in *Bachman*, 163 Ohio St.3d 195, 2020-Ohio-6732, 168 N.E.3d 1178, a magistrate had improperly held a woman in contempt. Bachman stipulated to all the charged misconduct. *See id.* at ¶ 3, 12. Nevertheless, we found that his failure to acknowledge the wrongful nature of his conduct constituted an aggravating factor, *id.* at ¶ 14, based on the board's finding that "he failed to appreciate the inappropriateness of his actions," *id*. at ¶ 15. Although Bachman had expressed regret for his conduct, we noted that he had focused on the effects that his misconduct had had on his career and had expressed no remorse for the harm that he caused to the woman who was the target of his misconduct. *Id*.

{¶ 83} *Bachman* illustrates that admitting a rule violation and acknowledging the wrongful nature of one's conduct are not the same. A finding that a respondent has acknowledged the wrongful nature of his conduct requires some showing that the respondent appreciates *why* his actions were inappropriate.

{¶ 84} We have also held:

> While a defendant is guaranteed the right to a trial and should never be punished for exercising that right or for refusing to enter a plea agreement, there is no federal or state constitutional right to lie on the witness stand. A defendant's act of lying while under oath is probative of his prospects for rehabilitation. Such an act is one of the factors that a trial judge may consider when imposing sentence under R.C. 2929.13.

*State v. O'Dell*, 45 Ohio St.3d 140, 543 N.E.2d 1220 (1989), paragraph two of the syllabus.

{¶ 85} Determining that a respondent in an attorney- or judicial-discipline proceeding has refused to acknowledge the wrongful nature of his conduct does not constitute an impermissible trial tax. This is because that determination does not turn on the fact that the respondent has exercised his right to a hearing and to have alleged rule violations proved by clear and convincing evidence under Gov.Bar R. V(12). Rather, such a determination focuses on the respondent's conduct, testimony, and demeanor during the course of the disciplinary proceedings—from the first allegations of misconduct through the panel hearing and the posthearing briefs.

{¶ 86} In this case, Gaul maintains that throughout the disciplinary proceedings, he has repeatedly acknowledged that he "blew it," "went too far," and engaged in "unacceptable" behavior with respect to the counts charged in relator's amended complaint. A careful review of the record demonstrates that while Gaul made these vague and generalized acknowledgements of wrongdoing at various times in his testimony, he also at times avoided answering direct questions about the impropriety of his conduct by deflecting blame or reframing the questions posed to him. Moreover, he failed to fully acknowledge the harm he caused to others.

{¶ 87} For example, when relator asked Gaul whether he "went too far" and abandoned his role as an impartial jurist in the Heard matter (Count 1), Gaul attempted to highlight his extensive judicial experience. Then, rather than answering the question that had been posed to him, he asked himself, "[D]o I wish I was more tempered?" He then answered his own question, "Yes." When relator repeated the question whether Gaul thought he had gone too far in the Heard matter, Gaul responded, "Yeah, I do," but he denied that he had abandoned his role as an impartial jurist.

{¶ 88} Later in the hearing, in response to a question from the panel chair about whether he had coerced Heard's guilty plea to avoid a trial, Gaul stated, "I regret that I became too involved." But he then attempted to deflect blame from himself, stating, "And quite frankly, you know, [defense counsel's] behavior was just so outrageous that * * * I'm sure that I was not as calm and deliberative as I should have been. I was extremely upset that an attorney would try and manipulate this case."

{¶ 89} At that point, the panel chair reminded Gaul that Heard's defense counsel's actions were not at issue. After explaining his view of the evidence indicating that Gaul had wanted to avoid a trial in the Heard matter, the panel chair reiterated his question, "So I just want to ask you this one more time. Isn't it clear that the intent —your intent was to avoid a trial and to have this defendant plead guilty or no contest?" At Gaul's request, the panel chair started to repeat the question. But before the panel chair could finish, Gaul answered, "No." Gaul then stated that he had "simply wanted to resolve the [Heard] case one way or the other" and claimed that he had tried "more cases than just about any other judge in Cuyahoga County" before suggesting that he had not wanted the case to be continued, "because [he] kn[ew] the victim [was] probably going to be intimidated." But the panel chair reminded Gaul that he had already denied a request for a continuance. The panel chair then rephrased his question to Gaul, asking, "Why shouldn't we conclude that your intent was to force this defendant to plead guilty or no contest to avoid a trial?" In response, Gaul expressed regret for giving the panel (or anyone else) *the impression* that he had committed misconduct. But Gaul never expressed any appreciation—let alone remorse—for the fact that his conduct in coercing the plea deprived Heard of his liberty for nearly two years.

{¶ 90} In a similar vein, Gaul acknowledged that he had gone too far in asking W.S. (Count 2) questions at trial that sought inadmissible or immaterial evidence. But his only expression of regret regarding that matter was for leaving

the panel with the *impression* that he had engaged in misconduct. He expressed no remorse for the harm he caused to W.S.—whose conviction was later vacated by the court of appeals due to structural error—or the effect of his conduct on public confidence in the judiciary.

{¶ 91} Nor did Gaul express any remorse for his in-court belittlement of Sergeant Chapman (Count 4) or for potentially affecting the sergeant's employment when he knew that a representative of the internal-affairs department for the sergeant's employer was in the courtroom.

{¶ 92} With respect to the Callahan matter (Count 3), Gaul admitted in his response to relator's initial letter of inquiry that he "blew it" at Callahan's sentencing hearing, and he reiterated that sentiment in his disciplinary-hearing testimony. He also admitted that his referring to Callahan as "a brother" was undignified, inappropriate, and did not meet the professional standards of the judiciary and that his statement that he would have "busted a cap" in Callahan was "unfortunate." He ultimately stipulated that he committed all of the misconduct charged in Count 3.

{¶ 93} But Gaul never expressed any regret or remorse for his exhibiting personal bias against Callahan by calling him a "murderer" and a "remorseless predator" *after* Callahan had been acquitted of all murder charges. Nor did he show any regret for the damage that his conduct under Count 3 inflicted on the public's perception of the judiciary. On the contrary, Gaul testified that he regretted that he had been "too lenient" in accepting the plea agreement in Callahan's earlier attempted-murder case and that as a result, he felt "personally responsible" and "a sense of moral responsibility for the death of [the victim in Callahan's second case]." His belated, posthearing stipulations to all the charged misconduct in the Callahan matter—including a violation of Jud.Cond.R. 2.11(A)(1) for his failure to recuse himself from the case—do not overcome his demonstrated lack of remorse for that conduct.

**{¶ 94}** Gaul's acknowledgments of the wrongfulness of his conduct under the remaining counts likewise miss the mark. We acknowledge that Gaul has voiced his regret for having allowed Viola's father to forward Gaul's February 2017 letter (expressing his support for Viola's efforts to overturn Viola's federal convictions) to the attorney general and that he self-reported that conduct to relator. However, his disciplinary-hearing testimony and his objections show that he has no real appreciation for the wrongfulness of his core acts of misconduct in that matter—namely, his decisions (1) to correspond with Viola on his court letterhead, (2) to express his opinion that Viola's federal convictions should be overturned, and (3) to offer Viola additional assistance in his efforts to overturn his federal convictions. Though Gaul deserves some credit for self-reporting his actions, we cannot overlook the seriousness of his conduct or its harm to the judiciary.

**{¶ 95}** While Gaul suggests that he acknowledged the wrongful nature of his conduct under Count 7 by dismissing the contempt charge against Smiley before Smiley served any portion of his 30-day contempt sentence, the record undercuts Gaul's claim in at least three respects. First, the only reason that Smiley had not served any portion of his contempt sentence was that Gaul had expressly ordered that the sentence be served *after* Smiley completed his other sentences. Second, Gaul testified that after the court of appeals reversed his contempt finding and remanded the case for further proceedings, he suggested to counsel that he would dismiss the contempt charge in exchange for an apology from Smiley. Third, after Gaul extracted a public apology from Smiley, it was not Gaul—but another judge— who actually dismissed the contempt charge. Therefore, Gaul's claims that he had recognized the wrongfulness of his misconduct and magnanimously dismissed Smiley's contempt charge paradoxically offer evidence that he has no appreciation for the inappropriateness of his actions. Not only has he not appreciably expressed regret for the effect that his actions had on the litigants and others in his courtroom, but he has failed to acknowledge the negative effects that his misconduct had on

public confidence in the independence, integrity, and impartiality of the judiciary. *See* Jud.Cond.R. 1.2.

{¶ 96} Therefore, we overrule Gaul's second objection to the board's report and adopt the board's finding that Gaul's refusal to acknowledge the wrongful nature of his conduct is an aggravating factor in this case. *See* Gov.Bar R. V(13)(B)(7).

### C. Gaul Engaged in Most of the Misconduct Not Stipulated by the Parties

{¶ 97} In his third objection to the board's report, Gaul argues that the board erred by determining that he engaged in any misconduct regarding the nonstipulated rule violations. As explained above, because Gaul did not engage in any misconduct in the Jackson matter to which he did not stipulate, we sustain his third objection in part. But because we conclude that he engaged in misconduct regarding all the remaining nonstipulated rule violations, we overrule the remainder of his third objection.

### D. The Appropriate Sanction in this Case Is a One-Year Suspension with No Stay

{¶ 98} In his fourth objection to the board's report, Gaul argues that the board erred in recommending a one-year actual suspension from the practice of law instead of a fully stayed one-year suspension. The board weighed Gaul's misconduct and the relevant aggravating and mitigating factors. It also considered several cases in which we imposed sanctions ranging from a partially stayed one-year suspension to an indefinite suspension on judges who committed misconduct bearing some similarity to that of Gaul's, though none of those cases involved a judge who had prior discipline. The board found that the facts underlying Gaul's misconduct were most comparable—albeit not an exact match—to those in *Disciplinary Counsel v. Parker*, 116 Ohio St.3d 64, 2007-Ohio-5635, 876 N.E.2d 556, and *O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286. In light of the differences between those cases and this case, the board recommends that Gaul be suspended from the practice of law for one year, with no portion of the

suspension stayed. It further recommends that Gaul be immediately suspended from judicial office, without pay, for the duration of his disciplinary suspension.

{¶ 99} Gaul objects to the board's recommended sanction, arguing, among other things, that his misconduct was far less widespread and egregious than the misconduct at issue in *Parker* and *O'Neill* and that he did not engage in any overt acts of dishonesty as the judges in those cases had. Gaul therefore maintains that the misconduct found by the board warrants a sanction no greater than a fully stayed one-year suspension and that an even less severe sanction would be appropriate if this court were to sustain his objections to any of the board's findings of misconduct.

{¶ 100} "We hold judges to the highest standards of professional behavior because they are invested with the public trust." *Carr*, 170 Ohio St.3d 401, 2022-Ohio-3633, 214 N.E.3d 496, at ¶ 86, citing *O'Neill* at ¶ 57. To maintain that trust, Canon 1 of the Code of Judicial Conduct charges judges with upholding and promoting the independence, integrity, and impartiality of the judiciary and avoiding impropriety and the appearance of impropriety. To that end, our primary purpose in disciplining judges "is to protect the public, guarantee the evenhanded administration of justice, and maintain and enhance public confidence in the integrity of [the judiciary]." *O'Neill* at ¶ 33.

## 1. Gaul's Misconduct Is Most Comparable to That in *Disciplinary Counsel v. Parker*

{¶ 101} In *Parker*, 116 Ohio St.3d 64, 2007-Ohio-5635, 876 N.E.2d 556, this court imposed an 18-month suspension from the practice of law, with six months conditionally stayed, on a judge who had committed 31 rule violations by, among other things, abusing his contempt power, failing to act impartially, attempting to coerce plea agreements in two criminal cases, and routinely mistreating criminal defendants and others in his courtroom. *Id.* at ¶ 6-55, 130.

{¶ 102} Gaul's misconduct mirrors Parker's in several respects. For example, Parker unreasonably and vindictively ejected a spectator from his courtroom without cause and briefly jailed her for contempt for muttering " 'I can't believe this' " as she exited the courtroom. *Id.* at ¶ 8. Gaul similarly abused his contempt power by sentencing Smiley (Count 7) to 30 days in jail for contempt for stating that Gaul made himself "look stupid" by vindictively raising Smiley's bond when Smiley could not be released because he was being held on other charges. With respect to these matters, to a large extent, Gaul's violations of the rules governing judicial and professional conduct parallel Parker's violations of the former codes of judicial conduct and professional responsibility.

{¶ 103} Parker also "cast grave doubt on his ability to act as an impartial arbiter" by presiding over a criminal case after he personally participated in the defendant's arrest. *Parker* at ¶ 12. Similarly, Gaul continued to preside over the bench trial for Callahan's charges even after he demonstrated a disturbing lack of impartiality by calling Callahan a "murderer" and a "remorseless predator" despite Callahan's having been acquitted of all murder charges. Gaul's lack of impartiality is even more striking than Parker's, given Gaul's admission during his testimony that at the time of Callahan's sentencing, he felt that he was personally and morally responsible for the victim's death because he had been "too lenient" in accepting a plea agreement in Callahan's previous attempted-murder case and had "kept Callahan on the street."

{¶ 104} Further, Parker *attempted* to coerce a plea agreement in a misdemeanor case and in a low-level felony case. *See Parker*, 116 Ohio St.3d 64, 2007-Ohio-5635, 876 N.E.2d 556, at ¶ 13-22. Although Parker pressured the state to offer a minor-misdemeanor plea deal in a domestic-violence case, the arresting officer refused to agree to that deal and the defendant was tried and acquitted. *Id*. at ¶ 13-16. In the other case, a pregnant woman had been charged with fifth-degree-felony theft of a credit card and misdemeanor possession of drug paraphernalia. *Id*.

at ¶ 19. Parker pressured the prosecutor to reduce the charge to a misdemeanor, but the prosecutor refused, insisting that a felony charge remain in the case. *Id.* The defendant thereafter signed a waiver of her right to a preliminary hearing, *id.*, but Parker rejected the waiver, apparently because he wanted to "help" the woman during her pregnancy and could not "in good conscience" allow the case to be bound over to common pleas court, *id.* at ¶ 20. Parker then held a preliminary hearing and ordered the state to produce evidence showing probable cause regarding the charged felony. *Id.* Thereafter, Parker concluded that the state had not shown probable cause regarding the felony charge and informed the state that the case would proceed on misdemeanor charges only. *Id.* at ¶ 21. Parker "then pressed defense counsel to have his client plead guilty to a misdemeanor, advising him perfunctorily that the court would sentence the defendant to a long time in jail." *Id.* At that point, the state moved to dismiss the charges in order to directly present them to the grand jury, but Parker denied the motion and ordered the state to refile the charge as a misdemeanor. *Id.* The state reluctantly complied, and the defendant ultimately pleaded guilty to a first-degree-misdemeanor theft charge. *Id.*

{¶ 105} Gaul, in contrast, unconstitutionally coerced plea agreements in two matters involving more serious felony offenses—the Heard and Byas matters—both of which resulted in significant prison sentences. Gaul's conduct was all the more egregious because he coerced Byas's plea about two years *after* his judgment had been reversed by the court of appeals for the same conduct in *Heard*, 2017-Ohio-8310, 87 N.E.3d 245, at ¶ 35. And by the time Heard was acquitted on remand, he had served nearly two years of the 14-year sentence Gaul had imposed under the plea deal.

{¶ 106} Gaul notes in his objections to the board's report that Parker was found to have "routinely mistreated those who appeared before him," *Parker* at ¶ 49. He therefore argues that Parker's misconduct was "meaningfully more widespread" than his own, which "was isolated to the eight discrete [counts]

identified in the [a]mended [c]omplaint," only four of which alleged violations of Jud.Cond.R. 2.8(B). Gaul further asserts that he never engaged in dishonest conduct, unlike Parker, who was found to have lied about his improper use of the 9-1-1 system and then pressured other attorneys to confirm his false narrative. *See Parker* at ¶ 39-41. Although Gaul has not been found to have engaged in dishonest conduct, he has engaged in other significant types of misconduct beyond those committed by Parker, perhaps the most egregious of which was the abuse of the prestige of his judicial office to assist Viola (Count 5) in his efforts to help overturn Viola's federal convictions.

{¶ 107} In *Parker*, 116 Ohio St.3d 64, 2007-Ohio-5635, 876 N.E.2d 556, the aggravating factors consisted of a dishonest motive, a pattern of misconduct, multiple offenses, and Parker's submission of false or deceptive statements about many of his instances of misconduct in an attempt to impede the disciplinary process. *Id.* at ¶ 59. The mitigating factors consisted primarily of Parker's clean disciplinary record and evidence of his good character. *Id.* This court also attributed some mitigating effect to Parker's treatment for a diagnosed mental disorder, even though the disorder did not qualify as a mitigating factor under a provision similar to Gov.Bar R. V(13)(C)(7). *See Parker* at ¶ 85-86.

{¶ 108} Both Parker and Gaul engaged in a pattern of misconduct and committed multiple offenses. But in this case, the additional aggravating factors of Gaul's prior discipline and the harm he caused to vulnerable persons in his courtroom distinguish this case from *Parker*.

{¶ 109} Balancing these factors, we find Gaul's misconduct to be at least as egregious as Parker's. Nevertheless, the board has recommended that Gaul receive a one-year actual suspension from the practice of law, which would be slightly more lenient than Parker's 18-month suspension with six months conditionally stayed, *see id.* at ¶ 130.

## 2. Gaul's Misconduct Is Not So Far Removed in Amount or Character from O'Neill's That It Warrants the Imposition of a Fully Stayed Suspension

{¶ 110} In *O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, we found that O'Neill committed 28 ethical violations through multiple incidents of misconduct, which relator grouped together based on the nature of the conduct and charged in multiple counts. *Id.* at ¶ 2-3, 20, 28, 40-41. Under one of the counts, we found that O'Neill had used a variety of coercive tactics to expedite dispositions in criminal cases, failed to act as an impartial arbiter, refused to follow a mandate from a court of appeals, acted as an advocate rather than as an impartial arbiter, and engaged in improper ex parte communications. *Id.* at ¶ 4, 8, 11. We also found that O'Neill had offered explanations and denials for her conduct that "were contradicted by virtually all of the witnesses to the[] events and, at times, by her own records." *Id*. at ¶ 19.

{¶ 111} Under another count, we found that O'Neill had engaged in a pattern of misrepresentation in her interactions with judges, litigants, attorneys, and court personnel that by itself warranted an actual suspension from the practice of law. *Id*. at ¶ 23, 52; *see also Disciplinary Counsel v. Fowerbaugh*, 74 Ohio St.3d 187, 658 N.E.2d 237 (1995), syllabus (recognizing a rebuttable presumption that when an attorney engages in a course of conduct involving dishonesty, fraud, deceit, or misrepresentation, the attorney will be actually suspended from the practice of law for an appropriate period). Under two other counts, we found that O'Neill had engaged in a pattern of rude, undignified, and unprofessional conduct and had personally solicited campaign contributions through a staff attorney who was a public employee under her control. *O'Neill* at ¶ 29-35, 42.

{¶ 112} Gaul argues that O'Neill's misconduct was significantly greater in scope and severity than his and that fewer aggravating factors and additional mitigating factors are present in his case. With the exception of O'Neill's selfish motive and submission of false statements in the disciplinary process, which, on

42

balance, bear weight similar to Gaul's prior discipline for similar misconduct, we find that the aggravating factors in this case and *O'Neill* are of virtually identical weight. *See id.* at ¶ 48. But in addition to O'Neill's mitigating factors of having had no prior discipline and her community involvement, *see id.* at ¶ 49, this court was convinced that O'Neill's repeated volatile outbursts and unprovoked intemperate actions pointed to a potential behavioral cause for her misconduct that would best be addressed by a mental-health professional. *Id*. at ¶ 54. Taking all the factors into account, this court rejected the board's recommendation that O'Neill be suspended from the practice of law for two years, and we instead imposed a two-year suspension with one year stayed on conditions focused on O'Neill's mental health. *Id*. at ¶ 55. This court further conditioned O'Neill's reinstatement on the submission of a favorable mental-health report and specified that upon reinstatement to the practice of law, she would be required to serve a period of monitored probation. *Id*.

{¶ 113} In this case, however, there is no suggestion or acknowledgement that Gaul's misconduct was related to any mental disorder or condition. And on these facts, we cannot accept Gaul's assertion that his misconduct is so far removed in amount or character from that involved in *O'Neill* that a fully stayed suspension is warranted. On the contrary, we have imposed actual suspensions from the practice of law for single egregious acts of misconduct by a magistrate or judge. In *Bachman*, 163 Ohio St.3d 195, 2020-Ohio-6732, 168 N.E.3d 1178, we held, "Disciplinary cases involving an abuse of judicial power, particularly one depriving a person of his or her liberty, are a significant violation of the public trust." *Id.* at ¶ 33. We stated, "When a judicial officer's misconduct causes harm in the form of incarceration, that abuse of the public trust warrants an actual suspension from the practice of law." *Id*. at ¶ 22. Finding it "necessary to send a strong message to members of the judiciary, to deter similar violations in the future, and to make crystal clear to the public" the wrongfulness of the judicial misconduct involved in

that case, we rejected the board's recommendation of a fully stayed six-month suspension. *Id.* at ¶ 36. Instead, we suspended Bachman from the practice of law for six months, with no portion of the suspension stayed. *Id*. at ¶ 37.

{¶ 114} In *Disciplinary Counsel v. Repp*, 165 Ohio St.3d 582, 2021-Ohio-3923, 180 N.E.3d 1128, we applied our holding in *Bachman* and imposed on Repp the same sanction that the board has recommended in this case—a one-year suspension with no portion of the suspension stayed—for having engaged in a single act of misconduct by ordering a spectator in his courtroom to submit to a drug test and then finding her in contempt and sentencing her to ten days in jail when she refused. *Id.* at ¶ 2, 25-33.

### 3. *Disciplinary Counsel v. Bachman* Requires Us to Impose on Gaul an Actual Suspension from the Practice of Law

{¶ 115} In his objections to the board's recommended sanction, Gaul seeks to distinguish the facts of his case from those in *Bachman* on the ground that in *Bachman*, this court imposed an actual suspension from the practice of law based on the judge's abuse of the contempt power that deprived a person of her freedom. He argues that Count 7 here (the Smiley matter) is the only count under which he abused his contempt power and that the contempt charge was ultimately dismissed before Smiley served any portion of the contempt sentence. Gaul also attempts to characterize his conduct in the Heard matter (Count 1) as "improper involvement in plea negotiations" and says that "[a]ppellate decisions overturning criminal convictions due to deficiencies in a plea and/or other judicial legal error occur throughout Ohio." He argues, "*Bachman* should not stand for the proposition that discipline—much less, an actual suspension—is warranted in each such instance." With this argument, Gaul continues to contradict his stipulated violation of Jud.Cond.R. 2.6(B) for coercing Heard's no-contest pleas and to deny that his conduct constituted an abuse of his judicial discretion that caused harm in the form

44

of incarceration—which is precisely the type of conduct for which *Bachman* prescribes an actual suspension from the practice of law.

{¶ 116} In this case, we have found that Gaul committed 29 rule violations under eight counts.  Among other things, he coerced no-contest pleas (the Heard and Byas matters), abandoned his role as an impartial arbiter (the Callahan and Smiley  matters), demeaned litigants and spectators in his courtroom (the Callahan and Collins matters), abused his contempt power to avenge a minor slight against him (the Smiley matter), and abused the prestige of his judicial office to advance the personal interests of a litigant in a federal case who had appeared in his courtroom on a related matter (the Viola matter).  Rather than promoting confidence in the independence, integrity, and impartiality of the judiciary, Gaul's conduct has called those essential elements of our justice system into question while harming multiple litigants.

{¶ 117} Therefore, after considering Gaul's arguments, the depth and breadth of his misconduct, the aggravating and mitigating factors—including his prior discipline for similar violations—and based on the authority of *Parker*, 116 Ohio St.3d 64, 2007-Ohio-5635, 876 N.E.2d 556; *O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286; and *Bachman*, 163 Ohio St.3d 195, 2020-Ohio-6732, 168 N.E.3d 1178, we overrule Gaul's fourth objection and find that the board's recommendation of a one-year suspension from the practice of law, with no portion of the suspension stayed, is the proper sanction for Gaul's misconduct.

## V.  CONCLUSION

{¶ 118} Accordingly, based on the misconduct found in this case, the aggravating and mitigating factors, and the applicable caselaw, Daniel Gaul is suspended from the practice of law in Ohio for one year.  Pursuant to Gov.Jud.R. III(7)(A), he is immediately suspended from judicial office without pay for the duration of his disciplinary suspension.  Costs are taxed to Gaul.

Judgment accordingly.

DEWINE, D'APOLITO, JAMISON, and DETERS, JJ., concur.

FISCHER, J., concurs in part and dissents in part, with an opinion.

DAVID A. D'APOLITO, J., of the Seventh District Court of Appeals, sitting for DONNELLY, J.

TERRI JAMISON, J., of the Tenth District Court of Appeals, sitting for STEWART, J.

BRUNNER, J., not participating.

_____

**FISCHER, J., concurring in part and dissenting in part.**

{¶ 119} I agree with the majority opinion that respondent, Daniel Gaul, committed numerous violations of the Code of Judicial Conduct and the Rules of Professional Conduct and should receive an actual suspension from the practice of law for his misconduct. But I think that the one-year actual suspension imposed by the majority opinion is too lenient and does not adequately protect the public. The majority opinion even finds that Gaul's misconduct is "at least as egregious," majority opinion, ¶ 108, than the judge's misconduct in *Disciplinary Counsel v. Parker*, 116 Ohio St.3d 64, 2007-Ohio-5635, 876 N.E.2d 556, in which this court imposed an 18-month suspension with 6 months conditionally stayed, *id.* at ¶ 130. Gaul's violations are more egregious than Parker's, especially given Gaul's prior discipline and the harm he caused to vulnerable persons in his courtroom. Thus, I conclude that a two-year actual suspension from the practice of law, with one year conditionally stayed, and a one-year term of monitored probation upon Gaul's reinstatement to the practice of law is the appropriate sanction to ensure that the public is protected. For that reason, I concur in the majority opinion but respectfully dissent from the sanction imposed.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Matthew A. Kanai, Assistant Disciplinary Counsel, for relator.

Gallagher Sharp, L.L.P., Monica A. Sansalone, and Shane A. Lawson, for respondent.

————————